Miles N. Clark, Esq.
Nevada Bar No. 13848
Matthew I. Knepper, Esq.
Nevada Bar No. 12796
KNEPPER & CLARK LLC
5510 So. Fort Apache Rd, Suite 30
Las Vegas, NV 89148
Telephone: (702) 856-7430
Facsimile: (702) 447-8048
Email: Miles.Clark@knepperclark.com
Email: Matthew.Knepper@knepperclark.com

Michael F. Ram (SBN 104805) (appearing *Pro Hac Vice*)
mram@forthepeople.com
Marie N. Appel (SBN 187483) (appearing *Pro Hac Vice*)
mappel@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Telephone: (415) 358-6293

Benjamin R. Osborn (appearing *Pro Hac Vice*)
102 Bergen St., Brooklyn, NY 11201
Phone: (347) 645-0464
Email: ben@benosbornlaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ANTHONY SESSA AND MARK SESSA, *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>ANCESTRY.COM OPERATIONS INC., a Virginia Corporation; ANCESTRY.COM, INC., a Delaware Corporation; ANCESTRY.COM LLC, a Delaware Limited Liability Company.<br><br><br>Defendants. | Case No.: 2:20-cv-02292-GMN-BNW<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE** |

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKEi

## **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. LEGAL STANDARD FOR MOTION TO DISMISS ..................................................... 2

III. ARGUMENT ................................................................................................................. 3

A.    This court has personal jurisdiction over Ancestry ................................................ 3

B.    Plaintiffs have properly alleged injury and Article III standing. .......................... 6

C.    Ancestry's use of Plaintiffs' likenesses is directly connected to commercial sponsorship. 12

D.    The newsworthy exception does not apply because there is no legitimate public interest in Plaintiffs' likenesses, and Ancestry is exploiting them for a commercial purpose. ............ 13

E.    Section 230 of the Communications Decency Act does not apply because the authors did not intend publication on the internet, and because Ancestry created the illegal content. .. 16

F.    Plaintiffs' claims are not preempted by copyright because Ancestry does not own or license yearbook copyrights, and Plaintiffs' likenesses are not copyrightable. ............................. 19

G.    Plaintiffs have stated a claim for intrusion upon seclusion .................................... 21

H.    Plaintiffs have stated a claim for violation of Nevada Deceptive Trade Practices. ............. 22

I.    Plaintiffs have stated a claim for unjust enrichment. .............................................. 22

J.    This Court should deny Ancestry's anti-SLAPP motion to strike. ......................... 22

IV. CONCLUSION ............................................................................................................. 24

# **TABLE OF AUTHORITIES**

## **Cases**

*Abdul-Jabbar v. General Motors Corporation*, 85 F.3d 407, 416 (9th Cir. 1996)...................... 14

*Aldrin v. Topps Co., Inc.*, 2011 WL 4500013 (C.D. Cal. Sept. 27, 2011) ............................ 14, 15

*Almquist v. Synergo, LLC*, No. 3:15-CV-01281-SB, 2016 WL 8732503 (D. Or. May 20, 2016).. 5

*Bancroft Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ................... 3

*Batzel v. Smith*, 333 F.3d 1018, 1034 (9th Cir. 2003).......................................................... 16, 18

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124 (9th Cir. 2010)........................... 5

*Breazeale v. Victim Servs., Inc.*, 878 F.3d 759 (9th Cir. 2017) .................................................. 16

*Callahan v. Ancestry.com Inc.*, No. 3:20-cv-08437-LB, 2021 WL 783524 (N.D. Cal., Mar. 1,
   2021) ............................................................................................................ 2, 7, 9, 17

*Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir. 2020) ........................................................ 8

*Coker v. Sassone*, 432 P.3d 746 (Nev. 2019)................................................................... 12, 23

*Columbia Broadcasting v. Democratic Comm*, 412 U.S. 94 (1973) .......................................... 15

*Davis v. Facebook, Inc.*, 956 F.3d 589, 600 (9th Cir. 2020) ................................................... 6, 7

*Downing v. Abercrombie Fitch*, 265 F.3d 994 (9th Cir. 2001)................................................ 9, 20

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017) ......................................................... 8

*Fair v. Roommates*, 521 F.3d 1157 (9th Cir. 2008).................................................................... 17

*Fair v. Roommates*, 521 F.3d 1157 (9th Cir. 2008).............................................................. 16, 18

*Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911 (Cal. Ct. App. 1996)................................................. 19

*Gaos v. Google Inc.*, No. 10–4809, 2012 WL 1094646 (N.D. Cal. Mar. 29, 2012)..................... 8

*Gates v. Discovery Communications, Inc.*, 34 Cal. 4th 679 (Cal. 2004) ..................................... 24

*Hetter v. District Court*, 110 Nev. 513 (Nev. 1994)................................................................... 9

*Hicks v. Richard*, 39 Cal.App.5th 1167 (Cal. Ct. App. 2019) ..................................................... 24

*In re Facebook, Inc., Consumer Privacy User Profile Litig.,* 402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................................................................................ 7, 8, 21

*In re Google, Inc. Privacy Policy Litigation*, No. 12-018382, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) ............................................................................................................................ 7, 8

*In re iPhone Application Litig.*, 844 F.Supp.2d 1040 (N.D. Cal.2012) ........................................ 8

*J2 Cloud Servs., Inc. v. Fax87*, No. 13-05353 DDP (AJWx), 2017 WL 1535083 (C.D. Cal. Apr. 27, 2017) .................................................................................................................................... 5

*Jordan Video, Inc. v. 144942 Canada Inc*., 617 F.3d 1146 (9th Cir. 2010) ................................ 19

*Kuhn v. Account Control Tech*., 865 F. Supp. 1443 (D. Nev. 1994) ........................................... 21

*Leasepartners Corp. v. Brooks Trust*, 113 Nev. 747 (Nev. 1997) ............................................. 22

*Leftenant v. Blackmon*, No. 2:18-cv-01948-EJY, 2020 WL 6815215 (D. Nev. Nov. 18, 2020).. 22

*Leidholdt v. L.F.P. Inc.,* 860 F.2d 890 (9th Cir. 1988) ............................................................... 15

*Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008) ........................................................... 3

*Magdaluyo v. MGM Grand Hotel, LLC*, No. 2:14-cv-01806-APG-GWF, 2017 WL 736875 (D. Nev. Feb. 24, 2017) .................................................................................................................. 21

*Maloney v. T3Media, Inc*., 853 F.3d 1004 (9th Cir. 2017) ................................................... 19, 20

*Manzarek v. Marine*, 519 F.3d 1025 (9th Cir. 2008) .................................................................... 2

*Mavrix Photo Inc. v. Brand Techs. Inc*., 647 F.3d 1218 (9th Cir. 2011) ................................... 3, 4

*Mayweather v. The Wine Bistro*, No. 2:13-cv-210-JAD-VCF, 2014 WL 6882300 (D. Nev. Dec. 4, 2014) ................................................................................................................................... 3, 9

*Nayab v. Capital One Bank*, 942 F.3d 480 (9th Cir. 2019) .......................................................... 2

*New Kids on the Block v. News Am. Pub*., 745 F. Supp. 1540 (C.D. Cal. 1990) ........................ 14

*Newcombe v. Adolf Coors Company*, 157 F.3d 686 (9th Cir. 1998) ........................................... 12

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE iv

*Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019) ................................................... 8

*Perfect 10, Inc. v. Talisman Communications*, 2000 WL 364813 (C.D. Cal. March 27, 2000)... 16

*Perkins v. Linkedin Corp.*, 53 F. Supp. 3d 1190 (N.D. Cal. 2014)............................................. 6, 8

*Piping Rock Partners , Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957 (N.D. Cal. 2013)

................................................................................................................................. 23

*quoting Eastwood v. Superior Court*, 149 Cal. App. 3d 409 (1983) ............................................. 13

*Robins v. Spokeo, Inc.*, 867 F.3d 1108 (9th Cir. 2017)................................................................ 8

*Rodriguez v. Your First Choice, LLC*, No. 2:16-cv-02447-APG-CWH (D. Nev. Oct. 25, 2017)

................................................................................................................................. 6, 8

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004)..................................... 5

*Shapiro v. Welt*, 389 P.3d 262 (Nev. 2017) ................................................................................ 23

*Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200 (1998)........................................... 13, 14

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ......................................................................... 6

*Uzuegbunam v. Preczewski*, No. 19-968, 2021 WL 850106 (U.S. Mar. 8, 2021)......................... 9

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017)................................. 8

*Wash. Shoe Co. v. A–Z Sporting Goods Inc.*, 704 F.3d 668 (9th Cir. 2012) ........................ 3, 4, 6

*White v. City of Sparks*, 341 F. Supp. 2d 1129 (D. Nev. 2004) ................................................ 15

*Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043 (N.D. Cal. 2018) ........................................ 8

*Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199 (9th Cir. 2006)............................... 3

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997).............................. 5

## **Statutes**

17 U.S.C. § 103 ......................................................................................................... 20

17 U.S.C. § 102 ......................................................................................................... 20

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKEv

47 U.S.C. § 230 ............................................................................................................... 16, 17

Cal. Civ. Code § 3344 ........................................................................................................... 12

Nev. Rev. Stat. § 41.660 ....................................................................................................... 22

Nev. Rev. Stat. § 597.770 .................................................................... 1, 11, 12, 13, 16

Nev. Rev. Stat. § 598.0915 .................................................................................................. 22

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKEvi

# I.  PRELIMINARY STATEMENT

Ancestry's motions to dismiss and to strike are based on two misunderstandings. <u>First</u>, Ancestry misunderstands the rights and the harm at issue. Plaintiffs assert a claim under Nev. Rev. Stat. § 597.770, which prohibits "the use of the name, voice, signature, photograph or likeness of a person on or in any product, merchandise or goods or for the purposes of advertising, selling or soliciting the purchase of any product, merchandise, goods or service" without written consent. Ancestry extracted Plaintiffs' names, photographs as minors, and biographical information from yearbooks, then used their likenesses to create advertisements for Ancestry.com and records that Ancestry users must pay subscription fees to access. Ancestry stole and profited from something that rightfully belongs to Plaintiffs: their likenesses.

Ancestry argues Plaintiffs cannot allege harm because their yearbooks are not secret. But there is no requirement in § 597.770 that the victim's likeness be entirely private (even if that were possible). Plaintiffs have the right to choose which uses they consent to and which they do not. Plaintiffs consented as minors, at a time when the internet did not exist, to have their photographs taken for yearbooks intended for use by their family and classmates. Plaintiffs did not consent to Ancestry using their likenesses decades later in advertisements and records Ancestry created to sell subscriptions to a worldwide audience. Plaintiffs have suffered harm by the denial of their statutory rights, and by Ancestry earning unjust profits from their likenesses.

<u>Second</u>, Ancestry misrepresents Plaintiffs' allegations about how Ancestry uses their likenesses. Plaintiffs do not "concede the content at issue . . . is merely hosted on Ancestry's website." (ECF No. 19 at 2.) Ancestry extracts information from yearbooks – including names, photographs, cities of residence, and school activities – and uses that personal information as raw material to create advertisements and records promoting its subscription services. (*See, e.g.*, ECF No. 1 at ¶¶ 45-57.) Far from "hosting" content created by authors, Ancestry does not even attempt to contact yearbook authors, much less gain their consent. (See ECF No. 1 at ¶¶ 49-51.)

The Complaint details three advertisements Ancestry created using Plaintiffs' likenesses. In one of these, Ancestry displays the Plaintiffs' names and photographs along with text

promising "There's more to see" about Plaintiffs – including higher-resolution versions of their photographs, estimated ages, birth years, and other biographical details – if the visitor "Sign[s] Up Now" for a paid subscription. (ECF No. 1 at ¶¶ 30-31; 42-43; 55.) In addition to use in advertising, Ancestry also uses Plaintiffs' likenesses to create records about Plaintiffs, then sells access to those records. (Id. at ¶¶ 25; 37; 52.) Nevada law forbids such use of a likeness "on or in any product" without written consent.

Most of Ancestry's arguments stem from its misunderstanding of the right to publicity, and of Plaintiffs' allegations. For this reason, and for the additional reasons below, Plaintiffs respectfully request this Court deny Ancestry's motion to dismiss and motion to strike. In the alternative, Plaintiffs respectfully request that if this Court grants Ancestry's motions in whole or in part, it should be with leave to amend.

Plaintiffs' counsel are pursuing a related case in the Northern District of California asserting similar claims under California law. *Callahan v. Ancestry.com Inc.*, No. 3:20-cv-08437-LB (N.D. Cal., filed Nov. 20, 2020). On March 1, Magistrate Judge Beeler denied Ancestry's motion to strike pursuant to California's anti-SLAPP statute. The court also granted with leave to amend Ancestry's motion to dismiss, finding (1) plaintiffs lacked Article III standing, and (2) Ancestry was entitled to CDA immunity. 2021 WL 783524, at *1 (N.D. Cal. March 1, 2021). For reasons discussed in detail below, Plaintiffs respectfully disagree with the California rulings on standing and CDA immunity, and urge this court not to adopt its reasoning, much of which is specific to California law.

## II. LEGAL STANDARD FOR MOTION TO DISMISS

On a 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. Marine*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). A claim survives if it is "plausible on its face." *Nayab v. Capital One Bank*, 942 F.3d 480 (9th Cir. 2019) (quotation omitted).

//

//

### III. ARGUMENT

**A.    This court has personal jurisdiction over Ancestry.**

Plaintiffs have the burden to show the Court has specific personal jurisdiction over Ancestry. To meet this burden, "the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Wash. Shoe Co. v. A–Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012) (quotation omitted). Where, as here, the cause of action sounds in intellectual property and tort, jurisdiction exists if the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo Inc. v. Brand Techs. Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citation omitted); *see also Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). Here, this Court has specific jurisdiction over Ancestry because Ancestry knowingly acquired the names and likenesses of specific people – including the named Plaintiffs – who it knew were likely Nevada residents. *See, e.g., Mayweather v. The Wine Bistro*, No. 2:13-cv-210-JAD-VCF, 2014 WL 6882300, at *4-5 (D. Nev. Dec. 4, 2014) (finding jurisdiction when defendants had no connection with the forum other than misappropriating a Nevada resident's likeness). And it intentionally used those names and likenesses as part of an advertising scheme designed to sell website subscriptions to the Plaintiffs' family and classmates, who it likewise knew were likely Nevada residents. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1287-88 (11th Cir. 2008) (jurisdiction exists "where the internet is used as a vehicle for the deliberate, intentional misappropriation of a specific individual's . . . likeness and that use is aimed at the victim's state of residence.").

This is not a case where liability stems from the mere offering of a passive website. Rather, Ancestry's liability stems from activities it purposefully directed to Nevada, knowing the brunt of their effects would be felt by Nevada residents. *See Yahoo! Inc.*, 433 F.3d at 1206-07 (9th Cir. 2006) (jurisdiction exists when the defendant "caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state.") (quoting *Bancroft Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)). Ancestry

acquired yearbooks from Nevada high schools and digitally extracted names, likenesses, and other biographical information of people who attended high school in Nevada. (ECF No. 1, at ¶¶ 3, 16, 22-45). By doing so, Ancestry misappropriated the intellectual property of people it knew were likely Nevada residents. *See Wash. Shoe Co.*, 704 F.3d at 670 (9th Cir. 2012) (finding jurisdiction "when [defendant's] only relevant contact with the state is a claim that it willfully violated a copyright held by a Washington corporation").

Ancestry acquired Plaintiffs' names and likenesses from their yearbooks for the express purpose of attracting potential subscribers who are related to or otherwise personally know the Plaintiffs. Ancestry.com encourages visitors to use the Ancestry Yearbook Database to "[f]ind out what your relatives were really like in high school and college." And Ancestry's statements to investors highlight the advertising value of features like "record hinting," an Ancestry advertising technique that entices non-paying users to become paying subscribers by promising access to records about family members.[1] Ancestry knows Plaintiffs' family and classmates are likely Nevada residents. *See Mavrix Photo Inc. v. Brand Techs. Inc.*, 647 F.3d 1218 (9th Cir. 2011) (personal jurisdiction existed when defendant placed misappropriated photographs on a website where advertisements directed at forum state residents appeared).

Ancestry claims that it could not have known "harm was likely to be suffered" in Nevada because the people whose likenesses it extracted from Nevada yearbooks might have moved to other states after school. (ECF No. 19, at pg. 7.) This strains credulity. Ancestry collected approximately 1.7 million records from Nevada yearbooks. (ECF No. 1, at ¶ 16.) Research by the Pew Research Center shows that more than 40% of adults in the U.S. live "in or near the

---

[1] *See* Form 10-Q filed June 30, 2016 by Ancestry.com LLC ("Our conversion marketing efforts are focused on converting registered users to paying subscribers through on-site messaging, email, targeted offers and compelling product features like record hinting."). Available at https://www.sec.gov/Archives/edgar/data/1575319/000157531916000041/ acom2016063010-q.htm#s77FC53301E940CD0A1BDD6FC46C1ABAC.

community where they grew up."[2] Ancestry knew some of the people whose names and likenesses it acquired from Nevada yearbooks would still live in Nevada, just as it knew some of the family and classmates it intentionally targets with advertisements using Plaintiffs' names and likenesses would be Nevada residents. *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1130 (9th Cir. 2010) (jurisdiction existed when defendant "had every reason to believe prospective clients in Northern California would see the website – indeed, attracting new business was the point"); *J2 Cloud Servs., Inc. v. Fax87*, No. 13-05353 DDP (AJWx), 2017 WL 1535083, at *12-13 (C.D. Cal. Apr. 27, 2017) (rejecting defendants' argument that it could not have known California residents would use its fax service website); *compare Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 807 (9th Cir. 2004) ("[t]he Advertisement was never circulated in California, and [defendant] had no reason to believe that any Californians would see it.").

Ancestry argues that because the misappropriations in Nevada account for only a small percentage of the total number of names and likenesses it has misappropriated from yearbooks all around the country, there can be no personal jurisdiction in Nevada. (ECF No. 19, at pg. 6.) As Ancestry would have it, because Ancestry also stole likenesses from people in other states, a Nevada court has no interest in redressing the theft Ancestry perpetrated on Nevada residents in violation of a Nevada statute providing statutory damages for non-celebrity plaintiffs. Courts have routinely rejected such reasoning. *Almquist v. Synergo, LLC*, No. 3:15-CV-01281-SB, 2016 WL 8732503, at *5 (D. Or. May 20, 2016) ("a 'percentage of business analysis' is not the proper test for personal jurisdiction, rather the proper test is whether the absolute amount of business conducted" supports jurisdiction) (quotation omitted); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F. Supp. 1119, 1126-1127 (W.D. Pa. 1997) (3,000 subscriptions, which was about 2 percent of total website subscriptions, was a sufficient basis for jurisdiction because the

---

[2] "Key Findings about American life in urban, suburban and rural areas", Kristen Bialik, May 22, 2018, at https://www.pewresearch.org/fact-tank/2018/05/22/key-findings-about-american-life-in-urban-suburban-and-rural-areas/.

Supreme Court emphasizes the nature and quality of contacts); *Wash. Shoe Co*., 704 F.3d at 675-76 ("[S]tates have a special interest in exercising jurisdiction over those who commit intentional torts causing injury to their residents.") (quotation omitted).

**B.  Plaintiffs have properly alleged injury and Article III standing.**

Plaintiffs have suffered two forms of injury, each of which separately satisfies the requirements for standing. *See Rodriguez v. Your First Choice, LLC*, No. 2:16-cv-02447-APG-CWH, at *9 (D. Nev. Oct. 25, 2017) (standing exists where the plaintiff has suffered an "injury in fact" that is "fairly traceable to the challenged conduct" and is "likely to be redressed by a favorable decision") (*quoting Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

<u>First</u>, Plaintiffs have suffered economic injury by Ancestry misappropriating and earning unjust profits from their likenesses. *See Fraley v. Facebook, Inc*., 830 F. Supp. 2d 785, 796 (N.D. Cal. 2011) (finding standing based on allegations "that Facebook has been unlawfully profiting from the nonconsensual exploitation of Plaintiffs' statutory right of publicity"). Courts in the Ninth Circuit regularly find standing based on a website's profiting from data unlawfully collected from consumers. In *Davis v. Facebook, Inc.*, 956 F.3d 589, 600 (9th Cir. 2020), plaintiffs had standing to sue Facebook for unauthorized collection of browsing histories because "Facebook profited from this valuable data." *Id.* at 600. Plaintiffs "retain[ed] a stake in the profits garnered from their personal browsing histories" because it would be "unjust for [Facebook] to retain it." *Id.* This "stake in [Facebook's] unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable" by Facebook's use. *Id. See also Perkins v. Linkedin Corp*., 53 F. Supp. 3d 1190, 1210 (N.D. Cal. 2014) (finding standing when the defendant was "alleged to have misappropriated Plaintiffs' names to promote LinkedIn and to grow LinkedIn's membership, which is indisputably economically valuable to LinkedIn").

Plaintiffs' likenesses have demonstrable economic value to Ancestry. Ancestry has profited by using Plaintiffs' likenesses in advertisements designed to convert non-paying users to paying subscribers (*see* ECF No. 1 at ¶¶ 29-32, 41-44 & 54-57), and in records designed to

attract new subscribers and retain existing subscribers (*see* ECF No. 1 at ¶¶ 26-28, 37-39, 52-54). In statements to its investors, Ancestry has recognized the value of the advertisements and records containing Plaintiffs' likenesses in converting non-paying users to subscribers and retaining existing subscribers.[3]

Ancestry relies solely on *In re Google, Inc. Privacy Policy Litigation*, No. 12-018382, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013) for the claim that a defendant's unjust enrichment does not confer standing in the Ninth Circuit. In *In re Facebook, Inc., Consumer Privacy User Profile Litig.,* 402 F. Supp. 3d 767, 786 (N.D. Cal. 2019), the Court discussed the *In re Google* decision at length, finding that the judge in that case "seems to *assume* that economic harm is required rather than examining whether it's required," and concluding that "[w]hether or not [the judge] was right about precedent at the time," more recent case law "provide[s] ample support for the conclusion that this type of privacy invasion alone creates standing." *Id.* at 786.

In the related California action, Magistrate Judge Beeler rejected unjust enrichment as a basis for standing based on a finding that plaintiffs did not "have a commercial interest in their images that precluded the platform's use." *Callahan v. Ancestry.com Inc*., No. 20-cv-08437-LB, 2021 WL 783524, at *8 (N.D. Cal. Mar. 1, 2021). This is at odds with Ninth Circuit authority finding the causation is the other way round: it is the defendant's unlawful profiting from plaintiffs' information that creates the plaintiffs' stake in the unjustly earned profits. *See*, *e.g., Davis,* 956 F.3d at 600. Non-celebrity plaintiffs in a right to publicity action need not demonstrate their likenesses had commercial value prior to the defendant's exploitation. *Fraley*, 830 F. Supp. 2d at 806.

<u>Second</u>, Plaintiffs have suffered injury by the invasion of two legally protected privacy rights: the right to exclude others from the commercial use of a likeness, as codified in Nev. Rev. Stat. §§ 597.770; and the right to freedom from intrusion upon seclusion. Under well-established

---

[3] *See supra* n. 1; *see also id.* ("[I]nability to offer . . .  valuable content as part of our family history research databases. . . could have a material adverse impact on our number of subscribers.").

Ninth Circuit authority, the invasion of long-recognized privacy right is itself a concrete harm sufficient to support Article III standing. *See, e.g. In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 784 (N.D. Cal. 2019) ("the law has long recognized that a privacy invasion is itself the kind of injury that can be redressed in federal court"); *Patel v. Facebook, Inc*., 932 F.3d 1264, 1273 (9th Cir. 2019) (defendant's collection of facial recognition data "invades an individual's private affairs and concrete interests"); *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1050 (N.D. Cal. 2018) ("The complaint need not include economic injury to establish standing for the intrusion upon seclusion, invasion of privacy, or unjust enrichment claims"); *Eichenberger v. ESPN, Inc*., 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law").

The grounds for standing are particularly strong where, as here, a legislature has created a specific law recognizing the privacy right and providing a legal cause of action. *See, e.g.*, *Rodriguez v. Your First Choice, LLC*, No. 2:16-cv-02447-APG-CWH, at *7-8 (D. Nev. Oct. 25, 2017) ("an alleged procedural violation of a statute can by itself manifest concrete injury where Congress conferred the procedural right to protect a plaintiff's concrete interests") (*quoting Robins v. Spokeo, Inc*., 867 F.3d 1108, 1113 (9th Cir. 2017)); *Eichenberger v. ESPN*, 876 F.3d 979, 983 (9th Cir. 2017) (standing based on violation of the VPPA); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (TCPA); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117–19 (9th Cir. 2020) (CIPA and Wiretap Act); *In re Google, Inc. Privacy Policy Litig.*, No. 12–1382, 2012 WL 6738343, at *5 (N.D. Cal. Dec. 28, 2012) (Wiretap Act); *In re iPhone Application Litig.*, 844 F.Supp.2d 1040, 1055 (N.D. Cal.2012) (Wiretap Act and SCA); *Gaos v. Google Inc*., No. 10–4809, 2012 WL 1094646, at *3 (N.D. Cal. Mar. 29, 2012) (SCA); *Perkins v. Linkedin Corp*., 53 F. Supp. 3d 1190, 1208 (N.D. Cal. 2014) (California's right to publicity statute).

The Supreme Court recently found standing based on a purely legal injury, even though redressability rested solely on a claim to nominal damages. The Court reasoned: "A contrary rule would have meant . . . that there was no remedy at all for these rights . . . not readily reducible to

monetary valuation." *Uzuegbunam v. Preczewski*, No. 19-968, 2021 WL 850106, at *5 (U.S. Mar. 8, 2021).

Ancestry makes five arguments against standing, all of which fail. <u>First</u>, Ancestry asserts, incorrectly, that "actual injury is a required element of plaintiffs' claims pursuant to Nevada's 'right of publicity' statute." (ECF No. 19, at 8.) Not so. The Nevada Supreme Court has unequivocally stated that "what the legislature intended was to allow plaintiffs a minimum of $750 in damages even if no actual damages could be proven in order to discourage such appropriation." *Hetter v. District Court*, 110 Nev. 513, 519 (Nev. 1994). Federal courts have recognized this unambiguous rule. *Mayweather*, 2014 WL 6882300, at *8.

This distinguishes the recent opinion in the related California action. The court rejected the invasion of a statutory right as a basis for standing because it believed Cal. Civ. Code § 3344(a) required actual injury as an element of a claim. *Callahan*, No. 20-cv-08437-LB, 2021 WL 783524, at *8.

<u>Second</u>, Ancestry argues the yearbooks from which Ancestry obtained the names and likenesses it used to generate advertisements and records are "not private" and therefore their "disclosure cannot cause harm." (ECF No. 19, at 8.) Ancestry's mistaken reading would turn Nev. Rev. Stat. §§ 597.770 *et seq.* on its head. The right to publicity is an intellectual property right meant to give Nevadans comfort they may safely place their likeness in the public eye, without fear someone will capture their likeness and exploit it for commercial gain. Accordingly, most right to publicity cases involve photographs or other material the plaintiff intentionally published or otherwise distributed, which the defendant then copied from a public or semi-public source. *See, e.g., Mayweather, No.* 2:13-cv-210-JAD-VCF, 2014 WL 6882300 at *8 (famous boxer intentionally placed his likeness in the public eye, which defendant then misappropriated); *Fraley*, 830 F. Supp. 785 at 799 (Facebook users intentionally uploaded their names and photographs); *Downing v. Abercrombie Fitch*, 265 F.3d 994 (9th Cir. 2001) (defendant copied plaintiffs' photograph from a published book).

So too here. Plaintiffs agreed as minor children to have their photographs taken for a high

school yearbook, which they believed would be distributed in print form primarily amongst the other students in their high school. Ancestry copied their likenesses from this semi-public source, then used the likenesses for profit. By claiming publication precludes liability, Ancestry gets the law precisely wrong. The Nevada statute exists so that Plaintiffs will feel encouraged to do things like publishing photos in a yearbook, or sharing profile pictures with friends (as in *Fraley*), without fear a company may copy and exploit their likeness for profit.

The cases Ancestry cites are not relevant. None involves a right to publicity claim stemming from the commercial use of a likeness. (*See* ECF No 19 pgs. 9 & 10.) Unlike the plaintiffs in those cases, Plaintiffs are not alleging harm from the mere disclosure of personal information. Plaintiffs allege Ancestry commercially exploited their personal information for its own financial gain without consent. It is the way Ancestry used Plaintiffs' personal information, not the mere fact of its disclosure, that created the harm and cause of action.

<u>Third</u>, Ancestry argues Plaintiffs cannot allege actual injury because Plaintiffs "do not allege Ancestry . . . used their names to promote its service." (ECF No. 19 at 9.) Ancestry mischaracterizes the Complaint. Plaintiffs allege three separate advertising techniques in which Ancestry used Plaintiffs' names, photographs, images, and likenesses to promote its services and products. The Complaint describes these techniques in detail:

(a). "Sign Up Now" messages show Plaintiffs' names and photographs, and promise "There's more to see" about Plaintiffs. Ancestry displays these advertising messages to website visitors to entice them to buy subscriptions. (ECF No. 1, at ¶¶ 30-31; 42-43.)

(b). Records show the Plaintiffs' names, photographs, ages, cities of residence, schools, grades, and other personal information, and encourage the viewer to "Upgrade" their subscription. Ancestry displays these records to users of its 14-day promotional "Free Trial" to demonstrate the breadth of personal information available on its the service and persuade users to buy subscriptions. (ECF No. 1, at ¶¶ 25-27; 37-39.)

(c). "Hint" emails show Plaintiffs' names, suggest Plaintiffs may be relatives of the recipients, and urge recipients to "See your hint" and learn more about Plaintiffs by visiting

Ancestry.com. Plaintiffs' names are displayed as hyperlinks, so that clicking on the name brings the recipient to a page soliciting subscription.

In addition to use in advertisements, Ancestry's use of Plaintiffs' images in records that subscribers must pay money to access is a separate and additional harm. (ECF No. 1 at ¶¶ 25; 37.) *See* Nev. Rev. Stat. § 597.770 (liability for use "on or in" products and goods).

<u>Fourth</u>, Ancestry argues Plaintiffs cannot demonstrate "actual injury" because they fail to allege "someone sought out their yearbook records and paid to access them." (ECF No. 13, at 10.) As Ancestry would have it, Plaintiffs must point to a specific person who would not otherwise have paid for Ancestry services, but chose to do so because they saw an advertisement with Plaintiffs' likenesses or sought access to the specific records with Plaintiffs' likenesses. There is no such requirement in § 597.770. Plaintiffs have the right not to sell their likenesses to anyone. The injury recognized by § 597.770 occurred when Ancestry created the records containing Plaintiffs' likenesses and made them part of the scheme Ancestry uses to promote its website subscriptions. By Ancestry's own admission, its techniques for attracting new subscribers are effective only if it has a vast database of names and likenesses available to populate its "Sign Up Now" messages, "Free Trial records, and "Hint" emails.[4] Proof that someone signed up for an Ancestry subscription specifically to view the named Plaintiffs' likenesses is not required. *See KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362, 365-66 (Cal. Ct. App. 2000) (claim arose under California's Right to Publicity statute when defendant website placed 417 photographs depicting 452 models on its website, without discussion of whether paying subscribers viewed specific photographs).

<u>Fifth</u>, Ancestry asserts that any injury cannot be redressed because the yearbooks containing Plaintiff's photographs are "available through a variety of forums." (ECF No. 13 at

---

[4] Form 10-Q filed June 30, 2016 by Ancestry.com LLC, *supra* n. 1 ("In order to retain and expand our subscriber base. . . we must continue to expend significant resources to acquire significant amounts of additional historical content, digitize it and make it available to our subscribers online.").

11.) Again, this misunderstands the nature of Plaintiffs' claims. Plaintiffs are not seeking that all copies of their yearbooks be removed from bookshelves. They seek that Ancestry cease exploiting their likenesses for its own commercial gain without their permission.

**C.  Ancestry's use of Plaintiffs' likenesses is directly connected to commercial sponsorship.**

Nevada's right to publicity excepts the use of a likeness when it "is contained in material which is commercially sponsored but the use is not directly connected with the commercial sponsorship." Nev. Rev. Stat. § 597.790(2)(a). Ancestry does not qualify for this exception, because it used Plaintiffs' names and likenesses in an advertising scheme designed to sell subscriptions, and sold access to Plaintiffs' names and likenesses as part of its product.

There are no cases interpreting the Nevada exception, but California's right to publicity statute contains a similar provision concerning use "directly connected with commercial sponsorship." Cal. Civ. Code § 3344(e). Nevada courts borrow from California case law when interpreting the right to publicity. *Coker v. Sassone*, 432 P.3d 746, 749 (Nev. 2019).

Under California law, whether a defendants' use is "connected with the commercial sponsorship" is a "question of fact" not appropriate for decision on a motion to dismiss or at summary judgment. *Newcombe v. Adolf Coors Company*, 157 F.3d 686, 693-94 (9th Cir. 1998). *Newcombe* reversed the district court's grant of summary judgment to the defendant, finding that a reasonable jury could conclude there was a "direct connection" between a drawing of the plaintiff on one page of a magazine, and a picture of a glass of beer on the opposing page. *Id.* Here, the connection between Ancestry's product, and Plaintiffs' likenesses, is even stronger, because Ancestry's messages include direct solicitations to purchase subscriptions, and because Plaintiffs likenesses are part of the product Ancestry is selling.

Ancestry's hypothetical – an online newspaper previewing an article about President Biden – is a false comparison. (*See* ECF 19, at 12.) Ancestry is not in the business of reporting newsworthy information. It sells access to Plaintiffs' personal information.

//

//

**D.  The newsworthy exception does not apply because there is no legitimate public interest in Plaintiffs' likenesses, and Ancestry is exploiting them for a commercial purpose.**

No Legitimate Public Interest. The newsworthy exception to Nevada's right to publicity statute provides that consent is not required for the use of a name, photograph, or likeness "in connection with a news, public affairs, or sports broadcast or publication." Nev. Rev. Stat. § 597.790(2)(c). Interpreting a similarly-worded exception in California's right to publicity statute, courts have found that the newsworthy exception tracks the First Amendment right to freedom of speech and excludes liability for "the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it." *Fraley*, 830 F. Supp. 2d at 804 (*quoting Downing*, 265 F.3d at 1001). The newsworthy exception "extends 'to almost all reporting of recent events,' as well as to publications about 'people who, by their accomplishments, mode of living, professional standing, or calling, create a 'legitimate and widespread attention' to their activities.'"). *Downing*, 265 F.3d at 1001 (*quoting Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 416 (1983)). Information that is primarily of personal or limited interest does not qualify for protection. The facts disclosed must concern an issue of "legitimate public interest." *Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 214-15 (1998).

Here, there is no legitimate public interest in the names, photographs, and likenesses Ancestry is using to sell subscriptions and advertise its services. Plaintiffs are not public figures. Photos of what they looked like as children are not of legitimate public interest, nor are the ages, names, school activities, and cities of residence Ancestry has extracted and associated with their photographs. *See Downing*, 265 F.3d at 994 (photograph did not concern a matter of public interest even when its subjects were professional surfers at a surfing competition).

Ancestry's public statements prove they envision the yearbook records being used for matters of personal, not public, interest. Ancestry.com encourages visitors to use the Ancestry Yearbook Database to "[f]ind out what your relatives were really like in high school and college." However interested an Ancestry subscriber may be in discovering what his cousin

looked like at age 12, it is not matter of legitimate public interest.

Tellingly, most of the authority Ancestry relies on concerns famous individuals whose names and likenesses were already in the public eye at the time of the alleged misappropriation. *See New Kids on the Block v. News Am. Pub.*, 745 F. Supp. 1540 (C.D. Cal. 1990) (famous boy band); *Aldrin v. Topps Co., Inc.*, 2011 WL 4500013 (C.D. Cal. Sept. 27, 2011) (astronaut). The members of New Kids on the Block and Buzz Aldrin are public figures who "create a legitimate and widespread attention to their activities." *See Downing*, 265 F.3d at 1001. Plaintiffs are not.

Facts about private individuals who are not public figures can be a matter of legitimate public interest, but only if those facts concern the private individual's involvement in an inherently newsworthy event. *See Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 215 (1998). In *Shulman*, the court found the public had a legitimate interest in a news report about a recent car accident in which the plaintiff had been involved. *Id.* at 212. Unlike the news report in *Shulman*, Ancestry's misappropriation, distribution, and use in advertising of Plaintiffs' photographs as children and other personal information is unrelated to any newsworthy event.

Commercial Purpose. Even if the photographs, names, and likenesses Ancestry misappropriated concerned matters of legitimate public interest (which they do not), Ancestry's use still would not qualify for the newsworthy exception because Ancestry uses this information for the commercial purpose of promoting its products and selling subscriptions. In *Fraley*, when Facebook users "liked" certain pages and brands, Facebook created "Sponsored Stories" communicating those likes to the users' Facebook friends. The *Fraley* court found that even if the fact of users liking certain pages and brands were a matter of legitimate public interest, the newsworthy exception still would not apply because Facebook had a commercial purpose for disclosing these facts. *Fraley*, 830 F. Supp. 2d at 805 ("Facebook's commercial use of those actions in Sponsored Stories removes them from the scope of § 3344(d)'s newsworthy privilege."). *See also Abdul-Jabbar v. General Motors Corporation*, 85 F.3d 407, 416 (9th Cir. 1996) (statements that a famous basketball player won an "award" three years in a row and was a "champ" concerned matters of public interest, but were not protected by the newsworthy

exception because they were made in an "advertisement, not in a news or sports account.").

Ancestry's commercial use of Plaintiffs' likenesses is even less worthy of protection than Facebook's use in *Fraley* because Plaintiffs have no preexisting relationship with Ancestry. In *Fraley*, the plaintiffs willingly created Facebook profiles, submitted their names and profile pictures to Facebook, agreed to Facebook's Terms of Service, and clicked links indicating they in fact "liked" the pages and brands that became the subjects of Sponsored Stories. Here, Plaintiffs and the class have no relationship with Ancestry, never agreed to the use of their names or likenesses by Ancestry for any purpose, and never indicated any endorsement of Ancestry.

Ancestry asserts that in considering whether the unauthorized use of a likeness qualifies for the newsworthiness exception, "[i]t is immaterial whether the use occurs in connection with a for-profit enterprise." (ECF No. 13, at 12.) This is incorrect, as Ancestry's own cited authority acknowledges. *See Aldrin v. Topps Co., Inc.*, 2011 WL 4500013, at *3 (C.D. Cal. Sep. 27, 2011) (speech at issue was newsworthy in part because "the images are not commercial speech"); *see also Columbia Broadcasting v. Democratic Com*m, 412 U.S. 94, 201 (1973) ("it has generally been understood that 'commercial' speech enjoys less First Amendment protection than speech directed at the discussion of controversial issues of public importance") (citation omitted). At most, the authority Ancestry cites stands for the proposition that artistic works and expressive speech about issues of public interest do not lose all First Amendment protection simply because they are being sold. *See White v. City of Sparks*, 341 F. Supp. 2d 1129, 1137 (D. Nev. 2004), *aff'd*, 500 F.3d 953 (9th Cir. 2007) (artist selling paintings in a public square); *Leidholdt v. L.F.P. Inc.,* 860 F.2d 890, 895 (9th Cir. 1988) (opinion article about pornography's impact on society). Here, Ancestry is not selling artistic works, nor is it selling expressive speech. It is selling access to Plaintiffs' personal information, and incorporating Plaintiffs' likenesses in messages soliciting subscriptions to Ancestry.com.

Ancestry argues that because Plaintiffs' names and likenesses are not being used to sell "an unrelated product," the use is protected under the newsworthy exception. (ECF No. 19 at 14-15.) As Ancestry would have it, because part of Ancestry's product offering includes access to

the Plaintiffs' misappropriated likenesses, Ancestry may use their likenesses in advertisements promoting the product. No such rule exists. Section 597.770 prohibits the unauthorized use of a person's likeness "on or in any product, merchandise, or goods," and prohibits use "for the purposes of advertising." Ancestry cannot avoid liability under the "advertising" part of the statute by violating the "on or in any product" part. Ancestry's position would produce the bizarre result that defendants could immunize themselves from liability by ensuring the likenesses they appropriate are as central as possible to the value of the products they sell – *i.e.*, the more they exploit Plaintiffs' likenesses, the less liability they would face. In fact, Ancestry has violated both parts of the statute. *See Perfect 10, Inc. v. Talisman Communications*, 2000 WL 364813, at *2 (C.D. Cal. March 27, 2000) (use of photographs on a website was both "for the purpose of advertising . . . the further sale of photographs and other works," and "for the purpose of selling the appropriated photographs through paid subscriptions.").

**E. Section 230 of the Communications Decency Act does not apply because the authors did not intend publication on the internet, and because Ancestry created the illegal content.**

Ancestry's misappropriation is not protected by § 230 of the Communications Decent Act ("CDA") for two independent reasons. <u>First</u>, under controlling Ninth Circuit authority, a website enjoys immunity under the CDA only for content the creator intended to be published on the Internet. *Batzel v. Smith*, 333 F.3d 1018, 1034 (9th Cir. 2003), *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017) (CDA immunity exists only "when a third person or entity that created or developed the information in question furnished it to the provider or user under circumstances in which a reasonable person . . . would conclude that the information *was provided for publication on the Internet*") (emphasis added); *Fair v. Roommates*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[I]f the editor publishes material that *he does not believe was tendered to him for posting online*, then he is the one making the affirmative decision to publish, and so he . . . [is] not entitled to CDA immunity.") (emphasis added).

In *Batzel*, the plaintiff sent an email to the defendant, which then defendant then

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

published on its website without asking consent. Applying the plain language of the CDA, which applies only to information "provided by another information content provider," the *Batzel* court concluded the defendant website could not claim CDA immunity:

> '[P]rovided' suggests, at least, some active role by the 'provider' in supplying the material to a 'provider or user of an interactive computer service.' One would not say, for example, that the author of a magazine article 'provided' it to an interactive computer service provider or user by allowing the article to be published in hard copy off-line. Although such an article is available to anyone with access to a library or a newsstand, it is not 'provided' for use on the Internet.

*Batzel*, 333 F.3d at 1032-33. The application of this rule to the present case could hardly be clearer. The authors who created and edited the yearbooks did so four decades ago when the Internet did not exist. They could not possibly have intended the content to be published online, by Ancestry or any other "interactive computer service." Under *Batzel*, allowing material "to be published in hard copy off-line" cannot and does not constitute "providing" the material to a website for online distribution. Accordingly, Ancestry is not protected by the CDA.

In the related California action, the Magistrate Judge Beeler found Ancestry qualified for CDA immunity. *Callahan*, No. 3:20-cv-08437-LB, 2021 WL 783524, at *10. Although Plaintiff's counsel cited *Batzel* in its briefing and discussed the rule in oral argument, the opinion makes no mention of *Batzel* or the discussion of *Batzel* in *Fair v. Roommates*.

<u>Second</u>, Ancestry created the records and advertisements that are the source of illegality. Section 230 of the CDA "applies only if the interactive computer service provider is not also an 'information content provider' . . . 'responsible, in whole or in part, for the creation or development of the offending content.'" *Fair*, 521 F.3d at 1162 (*quoting* CDA §230(f)(3)). This inquiry is informed by whether the website "materially contribut[ed] to its alleged unlawfulness." *Id.*

Here, Ancestry is an 'information content provider' ineligible for protection under CDA § 230 because it created the records and advertisements at issue in this case. Ancestry does not merely display pages from Plaintiffs' yearbooks as they were originally printed. It uses software

to digitally extract Plaintiffs' names, photographs, and personal information from yearbook pages, then uses the extracted elements as inputs in webpages and messages of its own design. For example, the screenshot at the top of page 10 of the Complaint depicts a record Ancestry created using Plaintiff Abraham's likeness. Ancestry extracted Mr. Abraham's photograph, name, yearbook date, school, and grade from a yearbook. Ancestry added some information of its own creation: an estimated birth year (1986) and age (12 years old). Ancestry then created a record in which Mr. Abraham's photograph is prominent and isolated (in the yearbook, the photo was one of many arranged in rows). Ancestry inserted a column of personal information to the right of his photograph (this does not exist in the yearbook). Finally, Ancestry added interactive buttons, including one prompting the user to "Upgrade" to a more expensive subscription.

True, the photographs and information that Ancestry uses as its raw materials are sourced from yearbooks Ancestry did not create. But an "information content provider" need not have created all of the content at issue; it suffices that Ancestry is "responsible . . . in part" for its creation. *Fair,* 521 F.3d at 1162. Here, the "part" of the content Ancestry created is precisely what rendered the content illegal.

Facebook's actions in the *Fraley* case are instructive. In *Fraley*, Facebook created advertisements using raw material supplied by its users. Users uploaded their names and photographs when they created accounts. When users "liked" certain pages or products, Facebook created a "Sponsored Story" and displayed it to other Facebook users. Facebook was responsible for the design and delivery of Sponsored Stories, but the names, photographs, and "likes" Facebook used to populate its Stories all came from user submissions. *See* 830 F. Supp. 2d at 791-92. Like Facebook, Ancestry uses existing information as raw material to populate records and advertisements it designed and created. Accordingly, Ancestry is an information content provider with respect to those advertisements and records, and is not protected by § 230 of the CDA. *See id.* at 802 (Facebook was a content provider because its "actions in creating Sponsored Stories go beyond 'a publisher's traditional editorial functions'") (*quoting Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003)).

1

2

**F. Plaintiffs' claims are not preempted by copyright because Ancestry does not own or license yearbook copyrights, and Plaintiffs' likenesses are not copyrightable.**

3

4

Ancestry does not own or license yearbook copyrights. When a defendant does not hold

5

exclusive copyright in a work, there is no preemption. *See KNB Enterprises v. Matthews*, 78 Cal.

6

App. 4th 362 (Cal. Ct. App. 2000). In *KNB Enterprises*, the defendant copied photographs from

7

a published website without permission from the copyright holders. In rejecting defendant's

8

copyright preemption argument, the court reasoned "[w]e do not believe a [California right to

9

publicity] claim is preempted under *Fleet* where, as here, the defendant has no legal right to

10

publish the copyrighted work." *Id.* at 374 (*citing Fleet v. CBS, Inc*., 50 Cal. App. 4th 1911 (Cal.

11

Ct. App. 1996)). Like the defendant website in *KNB Enterprises*, Ancestry did not obtain

12

permission from the copyright holders before it extracted names, photographs, and likenesses

13

from yearbooks. (ECF No. 1, at ¶ 51.) Having played fast and loose with copyright law, they

14

cannot now claim their disregard for copyright insulates them from liability under the right to

15

publicity.

16

Ancestry leans heavily on *Maloney v. T3Media, Inc*., 853 F.3d 1004, 1011 (9th Cir.

17

2017), but in *Maloney* it was the entity who created the photographs in question, and thus held

18

exclusive copyright, that chose to distribute the photographs on a website. The plaintiffs'

19

misappropriation claims were preempted because they were challenging a "copyright holder's

20

decision to distribute the copyright images themselves." *Maloney v. T3Media, Inc.*, 853 F.3d

21

1004, 1011 (9th Cir. 2017). So too in *Fleet. See Fleet v. CBS, Inc*, at 1914 (CBS had "exclusive

22

rights to distribute the motion picture" that was the source of the plaintiff's claims). In *Jordan

23

Video, Inc. v. 144942 Canada Inc*., 617 F.3d 1146, 1154-55 (9th Cir. 2010), preemption applied

24

when the plaintiff owned the copyright and asserted both copyright and right to publicity claims

25

arising from the unauthorized distribution of a video. Unlike *Jordan Video*, in this case neither

26

Plaintiffs nor Ancestry own exclusive copyright in Plaintiffs' yearbooks. Plaintiffs do not and

27

could not obtain redress of their injuries by asserting a copyright claim.

28

Plaintiffs' right to publicity claims stem from the misuse of their likenesses, which cannot

be copyrighted. Copyright preemption requires two conditions. "First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act." *Downing*, 265 F.3d at 1003 (internal citation omitted). Neither condition is met where, as here, the subject matter of Plaintiffs' claims is the likenesses and names pictured in their yearbooks, not the yearbooks themselves. *See id.* at 1003-1004 ("the 'work' that is the subject matter of the right of publicity is the persona . . . . Such name or likeness does not become a work of authorship because it is embodied in a copyrightable work such as a photograph.") (quotation omitted).

Ancestry again relies on *Maloney*, but the court's reasoning in *Maloney* does not support its argument. Seeking to reconcile several prior cases including *Downing*, the *Maloney* court reasoned that "preemption turns on how a copyrighted work is used." *Maloney*, 853 F.3d at 1013. If the defendant simply publishes an artistic work in which it holds copyright, preemption applies. But if the defendant goes "beyond the mere republication of the photograph" by using the photograph as part of an advertising scheme, then the defendant does injury to the uncopyrightable likeness, and there is no preemption. *Id., quoting Downing*, 265 F.3d at 1003. Here, Ancestry has gone far beyond "mere republication" of Plaintiffs' yearbook photographs. The Complaint details how Ancestry designed and created messages, webpages, and emails that use Plaintiffs' likenesses to advertise its products.

Ancestry makes much of the assertion Plaintiffs did not plead their names or images were used to explicitly "endorse[d] the product in question." (ECF No. 19, at 19.) But there is no requirement that an advertisement contain an explicit endorsement to support a Right to Publicity claim. *See Downing,* 265 F.3d at 999-1000 (photo published in a magazine contained no explicit endorsement, and no advertisements appeared on the same page); *KNB Enterprises,* 78 Cal. App. 4th at 365-66 (no indication models' photographs were used to imply endorsement); *Perfect 10 Inc.,* 2000 WL 364813, at *2 (same). Regardless, Plaintiffs have plead facts showing Ancestry's advertising techniques could reasonably create confusion as to whether Plaintiffs endorse

Ancestry. (*See, e.g.,* ECF No. 1, at ¶¶ 38-44.) An Ancestry user who receives "Sign Up Now" or "Hint" emails bearing Mark Sessa's name and likeness could reasonably conclude Mr. Sessa endorses Ancestry.com. At the very least, they could (falsely) conclude Mr. Sessa is an Ancestry user and willingly shared personal information with Ancestry.

**G.  Plaintiffs have stated a claim for intrusion upon seclusion.**

"To recover for the tort of intrusion, a plaintiff must establish: (1) an intentional intrusion (physical or otherwise); (2) on the solitude or seclusion of another; (3) that would be highly offensive to a reasonable person." *Magdaluyo v. MGM Grand Hotel, LLC*, No. 2:14-cv-01806-APG-GWF, 2017 WL 736875, at *6 (D. Nev. Feb. 24, 2017) (quoting *Kuhn v. Account Control Tech.*, 865 F. Supp. 1443, 1448 (D. Nev. 1994)). Whether conduct is offensive is typically left to a jury. *See id.* at *6 ("[W]hat kinds of conduct will be regarded as a 'highly offensive' intrusion is largely a matter of social conventions and expectations,' and is therefore a matter usually to be resolved by a jury").

Plaintiffs have alleged a reasonable expectation of privacy in the photographs and biographical information Ancestry is distributing for profit. (ECF No. 1 at ¶ 78.) Plaintiffs consented as minor children decades ago to have their photographs and names printed in yearbooks intended for use by their family and classmates. But Plaintiffs reasonably expect not to see their photographs and information distributed to a worldwide audience decades later for a profit-making purpose. People who willingly share personal information among a limited group of social connections do not lose their ability to assert privacy claims when a company shares that information much more broadly for profit. In *In re Facebook*, Facebook users retained a reasonable expectation of privacy even after they willingly shared personal information with their social connections on Facebook. "The fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law.'" 402 F. Supp. 3d at 782 (quotation omitted).

Plaintiffs have alleged facts sufficient for a reasonable jury to conclude Ancestry's conduct is highly offensive. The information is highly sensitive, including photographs of

Plaintiffs as minors, birth years, estimated ages, and geographical location.

**H.  Plaintiffs have stated a claim for violation of Nevada Deceptive Trade Practices.**

A defendant violates Nevada's Deceptive Trade Practices Act if it "Makes a false representation as to affiliation, connection, association with or certification by another person," or "Makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease." Nev. Rev. Stat. § 598.0915. Ancestry users could reasonably conclude that the people whose yearbook picture appears in Ancestry advertisements and searchable databases are Ancestry subscribers themselves or consented to Ancestry's use of their information. As such, Ancestry's use of their likenesses falsely represents Plaintiffs as being "afilliat[ed]", "connect[ed]", "associate[ed]", and "approv[ing]" of Ancestry.com. *See Leftenant v. Blackmon*, No. 2:18-cv-01948-EJY, 2020 WL 6815215, at *2 (D. Nev. Nov. 18, 2020) (claim arose when defendant "intentionally misled the public regarding [plaintiff's] affiliation" by using plaintiff's trademark on a Facebook page).

**I.  Plaintiffs have stated a claim for unjust enrichment.**

"[U]njust enrichment occurs 'when ever [sic] a person has and retains a benefit which in equity and good conscience belongs to another.'" *Leasepartners Corp. v. Brooks Trust*, 113 Nev. 747, 755 (Nev. 1997) (quotation omitted). As discussed more fully in Part III(B) above, Ancestry unjustly benefited from its by misappropriation and exploitation of Plaintiffs' right to publicity, an intellectual property right recognized by Nevada statutory law.

**J.  This Court should deny Ancestry's anti-SLAPP motion to strike.**

A defendant moving to strike must show "by a preponderance of the evidence, that the claim is based upon a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern." Nev. Rev. Stat. § 41.660(3)(a). If the defendant makes this showing, the burden shifts to the plaintiff to show "with prima facie evidence a probability of prevailing on the claim." *Id*. at § 41.660(3)(b).

Ancestry's anti-SLAPP motion should be denied because the records and advertisements at issue in this case are not "speech in direct connection with an issue of public concern."

Because Nevada's anti-SLAPP statute is "similar in purpose and language" to California's, Nevada courts look to California law for guidance on what constitutes "an issue of public interest." *Shapiro v. Welt*, 389 P.3d 262, 268 (Nev. 2017). California law establishes the following guiding principles:

> (1) "public interest" does not equate with mere curiosity;
>
> (2) a matter of public interest should be something of concern to a substantial number of people; a matter of concern to a speaker and a relatively small specific audience is not a matter of public interest;
>
> (3) there should be some degree of closeness between the challenged statements and the asserted public interest—the assertion of a broad and amorphous public interest is not sufficient;
>
> (4) the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another round of private controversy; and
>
> (5) a person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.

*Coker v. Sassone*, 432 P.3d 746, 751 (Nev. 2019) (*quoting Piping Rock Partners , Inc. v. David Lerner Assocs., Inc*., 946 F. Supp. 2d 957, 968 (N.D. Cal. 2013)).

Following these guidelines, it is clear decades-old personal information about a private citizen's appearance and activities in high school is not speech about a "public issue." Plaintiffs' photographs as minors do not "concern a substantial number of people." Ancestry itself envisions its records being of interest only to individuals seeking out information about their own families. (*See* Part III(D), *above*.) Nor can Ancestry convert private information about the Plaintiffs "into a matter of public interest simply by communicating it to a large number of people" via its website. Ancestry's distribution of Plaintiffs' names and likenesses does not communicate any substantive message on an issue of public interest. Rather, Ancestry's purpose is simply to sell subscriptions to its website. *See Coker v. Sassone*, 432 P.3d 746, 751 (Nev. 2019) (no public interest in sale of artistic works because the defendant's "focus was to profit from the sale of artwork").

The cases Ancestry cites in support of its motion demonstrate just how far removed Ancestry's conduct is from the kinds of activity courts view as "speech . . . in connection with an issue of public concern." The advertisements and records Ancestry created using Plaintiffs' likenesses, including their photographs as children, do not serve to warn the public against harassment. *See Hicks v. Richard*, 39 Cal. App. 5th 1167, 1172 (Cal. Ct. App. 2019) (letter reporting a principal's sexual harassment of multiple faculty members). Nor has Ancestry published a documentary on a matter of public interest in which Plaintiffs are important characters. *See Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (Cal. Ct. App. 1993); *Gates v. Discovery Commc'ns, Inc.*, 34 Cal. 4th 679 (Cal. 2004).[5]

In its ruling entered on March 1, 2021, Magistrate Judge denied Ancestry's anti-SLAPP motion on grounds that "Ancestry's inclusion of the yearbook information is not a public issue." Callahan, No. 3:20-cv-08437-LB, 2021 WL 783524, at * 11.

## IV. CONCLUSION

For the above-stated reasons, Ancestry's motions to dismiss and to strike should be denied. In the alternative, Plaintiffs should be granted leave to amend.

Dated: March 10, 2021

*/s/ Miles N. Clark*
Miles N. Clark, Esq.
Matthew I. Knepper, Esq.
KNEPPER & CLARK LLC
5510 So. Fort Apache Rd, Suite 30
Las Vegas, NV 89148
*Additional counsel listed on caption*

---

[5] Ancestry also cites *New Kids on the Block v. News Am. Pub.*, 745 F. Supp. 1540 (C.D. Cal. 1990), but that case does not concern an anti-SLAPP motion.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE24

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 10, 2021, and pursuant to the Federal Rules of Civil Procedure, a true and correct copy of the foregoing **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE,** was served via the U.S. District Court's electronic filing system to all parties appearing in this case.

/s/ *Lucille Chiusano*
An employee of KNEPPER & CLARK LLC