# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| ANTHONY SESSA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 2:20-cv-02292-GMN-BNW |
| vs. | ) | |
| | ) | **ORDER** |
| ANCESTRY.COM OPERATIONS INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court is the Motion to Dismiss, (ECF No. 19), filed by Defendants Ancestry.com Operations Inc., Ancestry.com, Inc., and Ancestry.com, LLC (collectively, "Ancestry"). Plaintiffs Anthony and Mark Sessa (collectively, "Plaintiffs") filed a Response, (ECF No. 26), and Ancestry filed a Reply, (ECF No. 27).

Also pending before the Court are Ancestry's Motions for Leave to File Notice of Related Decision, (ECF Nos. 32–33). Plaintiffs did not file a Response.[1]

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** the Motion to Dismiss.

## I.  BACKGROUND

This case arises from Ancestry's alleged use of Plaintiffs' names, images, and likenesses to market paid subscriptions to Ancestry's database of school yearbooks (the "Yearbook Database" or "the Database"). (*See* Compl. ¶¶ 2–3, ECF No. 1). Subscribers to Ancestry's Yearbook Database gain access to information derived from "billions of records belonging to hundreds of millions of Americans," including "over 1.7 million records from Nevada schools and universities." (*Id.* ¶ 3). To build the database, Ancestry allegedly, "extracted personal information from school yearbooks, then aggregated the extracted information into digital

---

[1] Pursuant to Local Rule 7-2(d), the Court **GRANTS** the Motions as unopposed.

records that correspond to and identify specific individuals." (*Id.*).  Plaintiffs allege that Ancestry's Yearbook Database includes, "the names, photographs, cities of residence, and schools attended" of individuals within the Database. (*Id.*).  Plaintiffs contend that they, and a prospective class of other similarly situated Nevadans whose names, images, and likenesses are in the database, neither received notice of nor consented to Ancestry's use thereof. (*Id.* ¶¶ 4, 23–25, 35–37).

Ancestry sells access to the Yearbook Database through paid subscriptions ranging from $24.99 to $49.99 per month. (*Id.* ¶ 6).  Subscribers, depending on the level of their subscription, may perform a range of functions within the Database, including the ability to search, view, and download records. (*Id.*).  Within the Yearbook Database, subscribers may access information including, "the names, photographs, cities of residence, schools attended, estimated ages, likenesses, and identities Ancestry has amassed in its Ancestry Yearbook Database[.]" (*Id.*).  Ancestry allegedly uses Plaintiffs' names, images, and likenesses to "advertise, sell, and solicit the purchase" of subscriptions in three ways: (1) providing free trials through which users can access Plaintiffs' profiles; (2) providing all visitors to the Database with limited access that generates pop-up advertisements with Plaintiffs' names and images; and (3) sending targeted promotional emails to prospective customers bearing Plaintiffs' names and images. (*Id.* ¶¶ 8– 12, 26, 29–30, 32, 37–38, 41–44).

### A.    Free Trial

Plaintiffs argue that prospective subscribers may enroll in a 14-day free trial that "provides temporary access to search, view, and download records from Ancestry's databases" to induce users to pay for a monthly subscription. (*Id.* ¶¶ 8–9).  Ancestry allegedly encourages users to search the Yearbook Database for the names of "people they may know or be curious about." (*Id.*).  When searching for a particular individual within the Database, subscribers may view, "the individual's name, yearbook photo, estimated age, city of residence, school attended,

and year of attendance." (*Id.*).  Free subscribers may also "view and download full-resolution version[s] of yearbook photos of the individuals they have searched." (*Id.*).

**B.     Limited Access**

Any visitor to Ancestry.com may view the Yearbook Database, but visitors only receive limited access unless they sign up for a free trial or paid subscription. (*Id.* ¶ 10).  Limited-access users may search an individual by name and "receive a list [sic] records, each of which corresponds to a specific identifiable person, and includes the individual's name, city of residence, and a low-resolution version of a yearbook photo." (*Id.*).  However, "Users cannot view the full-resolution version of the photograph or view additional information about the person such as estimated age, name of school, and yearbook year." (*Id.*).  If users attempt to click-through to any of the listed information, they are redirected to a page encouraging them to sign up for a paid subscription. (*Id.*).  Alternatively, if users scroll over the "View Record" link on individuals' profiles, they are presented with a pop-up advertisement bearing the name and image of the person whom they have searched. (*Id.* ¶¶ 31–32, 42–43).  The advertisement says, "There's more to see," with a low-resolution thumbnail photo of the individual and a preview of the type of information accessible through a subscription, including the person's estimated age, yearbook date, school location, birth year, and school of attendance. (*Id.*).

**C.     Email Solicitation**

Plaintiffs also allege that Ancestry advertises subscriptions to the Yearbook Database through promotional emails. (*Id.* ¶ 12).  Plaintiffs allege that their names and images have been used in promotional emails for the Yearbook Database, which Ancestry has targeted at people who may be related to Plaintiffs. (*Id.* ¶¶ 12, 32, 44).

Plaintiffs raise the following claims based upon Ancestry's alleged use of Plaintiffs' names, images, likenesses, and personal information for the purpose of advertising, selling, and soliciting subscriptions to the Yearbook Database: (1) violation of the Nevada Right of

Publicity Act, NRS §§ 597.770, *et seq.*; (2) violation of the Nevada Deceptive Trade Practices Act, NRS §§ 598.0903, *et seq.*; (3) intrusion upon seclusion; and (4) unjust enrichment. (*Id.* ¶¶ 68–87).  Ancestry now moves to dismiss the Complaint. (*See generally*, Mot. Dismiss ("MTD"), ECF No. 19).

## II.   <u>LEGAL STANDARD</u>

### A.   12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits motions to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  When subject matter jurisdiction is challenged, the burden of proof is placed on the party asserting that jurisdiction exists. *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (holding that "[t]he party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists").  Accordingly, the court will presume lack of subject matter jurisdiction until the plaintiff proves otherwise in response to the motion to dismiss. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

A motion to dismiss under Rule 12(b)(1) may be construed in one of two ways. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  It may be described as 'facial,' meaning that it attacks the sufficiency of the allegations to support subject matter jurisdiction. *Id.*  Alternatively, it may be described as 'factual,' meaning that it "attack[s] the existence of subject matter jurisdiction in fact." *Id.*  When, as here, a court considers a 'facial' attack made pursuant to Rule 12(b)(1), it must consider the allegations of the complaint to be true and construe them in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).

### B.   12(b)(2)

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2).  Once a defendant

raises the defense, the burden falls on the plaintiff to prove sufficient facts to establish that jurisdiction is proper. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  A plaintiff can carry its burden only by presenting sufficient evidence to establish that (1) personal jurisdiction is proper under the laws of the state where it is asserted; and (2) the exercise of jurisdiction does not violate the defendant's right to due process secured by the United States Constitution. *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995).

When no federal statute governs personal jurisdiction, the district court applies the law of the forum state. *See Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Nevada has authorized its courts to exercise jurisdiction over persons "on any basis not inconsistent with . . . the Constitution of the United States." NRS 14.065.  Thus, the Due Process Clause of the Fourteenth Amendment is the relevant constraint on Nevada's authority to bind a nonresident defendant to a judgment of its own courts. *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).

The Due Process Clause requires that the nonresident must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make "a prima facie showing of jurisdictional facts." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006) (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001)).  When analyzing such a 12(b)(2) motion, "the court resolves all disputed facts in favor of the plaintiff." *Id.*

C.    **12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule

12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the Court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

The Court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is *plausible*, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

A court may also dismiss a complaint pursuant to Federal Rule of Civil Procedure 41(b) for failure to comply with Federal Rule of Civil Procedure 8(a). *Hearns v. San Bernardino Police Dept.*, 530 F.3d 1124, 1129 (9th Cir. 2008).  Rule 8(a)(2) requires that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Furthermore, the Supreme Court has rejected any sort of "heightened" pleading requirement for § 1983 municipal liability claims because such a heightened pleading standard cannot be "square[d] . . . with the liberal system of 'notice pleading' set up by the Federal Rules." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion . . . . However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted).  Similarly,

"documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss becomes a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

If the court grants a motion to dismiss, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of . . . the amendment, [or] futility of the amendment . . . ." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

## III.   **DISCUSSION**

Ancestry raises three primary grounds for dismissal of Plaintiffs' Complaint. First, Ancestry argues it does not have sufficient contacts with Nevada to create personal jurisdiction. (MTD 5:16–7:25). Second, Ancestry argues that Plaintiffs lack standing to raise their claims. (*Id.* 6:1–11:19). Third, Ancestry argues that Plaintiffs fail to state a claim upon which relief can be granted both because the claims are precluded by applicable affirmative defenses and because the claims are not adequately pleaded. (*Id.* 11:20–22:21). Ancestry also seeks to have the Complaint stricken under Nevada's Anti-SLAPP statute. (*Id.* 22:22–24:24). The Court's below discussion begins with Plaintiffs' standing.

//

### A.     Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 537 U.S. 149, 157 (2014) (quoting U.S. Const., art. III, § 2).  Justiciable cases and controversies arise only when a plaintiff has a personal interest in the litigation sufficient to confer standing. *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008).  "The irreducible constitutional minimum of standing" is comprised of three elements: (1) The Plaintiff must have suffered an "injury-in-fact," which is a "concrete and particularized" invasion of a legally protected interest; (2) there must be a "causal connection" between the plaintiff's injury and the defendant's action; and (3) it must be "likely" that the plaintiff's injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38–43 (1976)).  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Ancestry primarily argues that Plaintiffs have not alleged a concrete injury because Plaintiffs' yearbook pictures were published before Ancestry's use of the photos, and Ancestry's use neither caused Plaintiffs economic harm nor economically benefited Ancestry. (MTD 8:19–11:5).  Plaintiffs respond that they have sustained both economic injury and injury to their "legally protected privacy rights." (Pls.' MTD Resp. 6:5–9:2).  The Court concludes that Plaintiffs have alleged concrete injury sufficient to confer standing because they seek relief for claims analogous to those available at common law.

#### 1.   Injury in Fact

The parties dispute whether Ancestry's alleged violation of the Nevada Right of Publicity Statue provides constitutional injury sufficient to confer standing.[2]  The Supreme

---

[2] Plaintiffs have also alleged other claims that may be capable of providing standing.  However, the Court need not reach Plaintiffs' standing to raise the claims as they are later dismissed.

Court recently addressed when statutory claims satisfy Article III's injury requirement in *TransUnion LLC v. Ramirez* ("*TransUnion*"), 141 S. Ct. 2190 (2021). The class of plaintiffs in *TransUnion* were individuals whose credit reports mistakenly noted them as "potential match[es]" with names on the list of terrorists, drug traffickers, and other serious criminals maintained by the United States Treasury Department's Office of Foreign Assets Control. *Id.* at 2201. Plaintiffs brought suit under the Fair Credit Reporting Act, alleging that TransUnion failed to comply with the Act's mandate to follow reasonable procedures to ensure the accuracy of information in a consumer's credit file. *Id.* at 2202. The class included 8,185 consumers, only 1,853 of whom had their offending credit reports published to third parties. *Id.* The Supreme Court concluded that only those whose reports were published suffered concrete injury capable of providing standing. *Id.* at 2208–2213.

The Court explained that "concrete injury" for Article III purposes requires that a Plaintiff sustain harm that, "has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *Id.* at 2200 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). Additionally, Congress may authorize a cause of action for concrete harms that were previously inadequate to sustain a legal action like, for example, discriminatory treatment. *Id.* at 2204. However, where a statutorily authorized cause of action has neither a close relationship to a traditional harm nor authorizes a remedy for other concrete harm, the claim fails to present a justiciable "case or controversy" under Article III. *Id.* at 2204–05.

For the *TransUnion* plaintiffs, those who had their credit reports published to third parties suffered harm akin to defamation, enabling them to maintain their claims. *Id* at 2208–09. However, those whose credit reports had never been published to others did not sustain actual harm. *Id.* at 2210. Instead, they suffered only prospective harm that would come to fruition if their credit reports were published, but the prospective harm was neither concrete nor

traditionally compensable. *Id.*  Before enactment of the FCRA, the uninjured subset of the class would have no remedy for the prospective harm in federal court. *Id.*  And despite Congress enacting a private right of action in the FCRA, the Article III injury requirement remained unchanged for plaintiffs seeking remedies under the statute. *Id.* Given the absence of Article III injury, plaintiffs lacked standing to sue in federal court. *Id.*

Here, Plaintiffs have standing to sue under the Nevada Right of Publicity Act.  The Act did not create previously unrecognized claims by legislative fiat.  Rather, the right of publicity has existed at common law, and the legislature codified the right.  *See PETA v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1279, 1285 (Nev. 1995) (overruled in part on other grounds) (explaining the elements of common law right of publicity claims).  Plaintiffs have alleged injury recognized at common law because they assert that Ancestry used their names and likenesses "to motivate a decision to purchase a particular product or service." *Knight v. Climbing Magazine*, 3:11-cv-0146-LRH-RAM, 2012 U.S. Dist. LEXIS 179412, 2012 WL 6627821, at *3 (D. Nev. Dec. 18, 2012).  Two recent cases noticed by the parties following briefing provide context for Plaintiffs' claimed injury.

Ancestry supplemented its Motion to Dismiss with a recent case from the Northern District of California involving identical class claims against Ancestry. (*See* Mot. Leave File, ECF No. 32).  In *Callahan v. Ancestry.com*, the California district court concluded that the Plaintiffs lacked standing to raise their claims. No. 20-cv-08437-LB, 2021 U.S. Dist. LEXIS 112036, 2021 WL 2433893 (N.D. Cal. June 15, 2021).  The court characterized plaintiffs' claims as raising only "statutory injury." *Id.* at *4.  However, the court did not address whether the statutory injury had a close common law analog as required by *TransUnion* and *Spokeo*.  Finding that the plaintiffs failed to assert either economic injury or violation of intangible privacy rights, the court found that plaintiffs lacked standing. *Id.*

But, as Plaintiffs highlight, the Northern District of Illinois recently reached the opposite conclusion in *Lukis v. Whitepages, Inc.*, No. 19-C-4871, 2021 U.S. Dist. LEXIS 132843, 2021 WL 3022319 (N.D. Ill. July 16, 2021).  In *Lukis*, the plaintiffs alleged that Whitepages had used their images in advertising. *Id.* at *3.  Whitepages moved to dismiss for lack of standing. *Id.*  The court concluded that plaintiffs had standing to raise statutory violations under the Illinois Right of Publicity Act given that the right of publicity arose at common law. *Id.* at *4. In reaching its conclusion, the court explained, "It necessarily follows, under the analysis articulated in *Spokeo* and recently reiterated in *TransUnion*, that an IRPA violation inflicts a concrete injury-in-fact under Article III." *Id.*

The Court declines to follow the California court's conclusion because its order did not address whether the plaintiffs' statutory injury had a common law analog as required by *Spokeo* and *TransUnion*.  Right of publicity claims, while often codified by state statute, have their origins at common law. *See Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953) (first to explicitly recognize a right of publicity) ("We think that . . . a man has a right in the publicity value of his photograph, i.e., the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made 'in gross,' i.e., without an accompanying transfer of a business or of anything else. . . . This right might be called a 'right of publicity.'"), *cert. denied*, 346 U.S. 816 (1953).  At common law, even individuals whose likenesses did not have inherent value could assert a property interest in their likenesses. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 28:7 (5th ed. 2021) ("The right of publicity protects against the unpermitted use of the identity of everyone: both those that fall into the vague category of 'celebrities' and those that do not. . . . Occasional judicial statements that the right of publicity protects the identity of only 'celebrities' are simply wrong.").  The use of an individual's likeness for commercial purposes, even of a relatively unknown person, establishes common law injury for right of publicity claims as long

as the individual is recognizable.[3] *Id.*; *see also Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 825–27 n.11 (9th Cir. 1974) (overruled in part on other grounds) ("[T]he appropriation of the identity of a relatively unknown person may result in economic injury or may itself create economic value in what was previously economically valueless."); *PETA v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1284 (Nev. 1995) ("the right of publicity refers to a property right in a person's identity. This property right is infringed by the unpermitted use of a person's identity for money-making purposes.").

Here, Plaintiffs have alleged that Ancestry has used Plaintiffs' names, images, and likenesses in targeted email advertising to Plaintiffs' relatives to advertise Ancestry's subscription services. (Compl. ¶¶ 32, 44). Plaintiffs also allege that Ancestry's limited access users have accessed Plaintiffs' profiles, and when the users scrolled over the "View Record" link on the profile, they were presented with a pop-up advertisement bearing Plaintiffs' names and images that encouraged them to "Sign Up Now" for a paid subscription. (*Id.* ¶¶ 31–32, 42–43). Both allegations indicate that Ancestry has used Plaintiffs' likeness for commercial purposes, which suffices to establish injury in fact under the common law tort.[4] Accordingly, the Court concludes that Plaintiffs have standing to maintain their right of publicity claim.

---

[3] Ancestry argues that Plaintiffs have not suffered injury because their yearbook information has been published and is accessible to the public. (MTD 8:19–9:10). Ancestry is mistaken on two counts. First, right of publicity claims do not depend on the publication of private photos, but rather the use of one's likeness for commercial purposes. *See, e.g.*, *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) (use of published photograph of surfing champions in advertising violated plaintiffs' right of publicity despite prior publication). Second, Ancestry relies on cases involving misappropriation of individuals' personally identifying information ("PII"), but not content within the scope of the plaintiffs' publicity rights; in fact, the only case Ancestry cites evaluating both types of claims found no standing for the PII disclosure but standing for the related right of publicity claim. *See In re Google, Inc. Privacy Policy Lit.*, NO. C.-12-01382-PSG, 2013 U.S. Dist. LEXIS 171124, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013).

[4] Ancestry attempts to spin cases involving false endorsement claims to suggest that *only* false endorsement claims demonstrate injury capable of providing standing. (MTD 9:11–10:1). While advertisements depicting persons' likeness often use the likeness to imply the individual endorses the product promoted, the use of one's likeness to promote a product is sufficient to state a right of publicity claim—even if there is no false impression of endorsement—as long as the person is recognizable. *Motschenbacher*, 498 F.2d at 825–27 n.11 (9th Cir.

1

### 2.  Causation, Redressability

2      Ancestry also argues that even if the Court finds Plaintiffs suffered injury, Ancestry did

3  not cause the injury, and the injury would not be redressable. (*Id.* 11:6–19).  The Court finds

4  that Plaintiffs have satisfied the remaining elements of standing.  Ancestry has allegedly used

5  Plaintiffs' images to market its services without compensation or consent, violating their

6  publicity rights. (Compl. ¶¶ 14, 33, 45).  A favorable ruling would redress the injury by

7  compensating Plaintiffs for the use of their image in advertising and/or enjoining Ancestry's

8  further use thereof.  Thus, Plaintiffs have standing to raise their right of publicity claim before

9  this Court.

10    **B.    Personal Jurisdiction**

11     Plaintiffs argue that Ancestry's contacts with Nevada giving rise to this action establish

12  specific personal jurisdiction. (Pls.' MTD Resp. 3:2–6:4).  Specific personal jurisdiction refers

13  to "jurisdiction based on the relationship between the defendant's forum contacts and the

14  plaintiff's claims." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007).  Personal jurisdiction

15  must arise out of "contacts that the defendant himself creates with the forum State." *Walden v.*

16  *Fiore*, 571 U.S. 277 (2014) (internal quotations omitted).  Further, personal jurisdiction cannot

17  be established from the conduct of a plaintiff or third parties within the forum. *Id.*  In other

18  words, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285.

19     Courts utilize a three-prong test to analyze whether the assertion of specific personal

20  jurisdiction in a given forum is proper:

21      (1) The non-resident defendant must [(a)] purposefully direct his activities or
        consummate some transaction with the forum or resident thereof; or [(b)] perform
22      some act by which he purposefully avails himself of the privilege of conducting
        activities in the forum, thereby invoking the benefits and protection of its laws;
23

24

25

_____

1974); *see also Knight v. Climbing Magazine*, 3:11-cv-0146-LRH-RAM, 2012 U.S. Dist. LEXIS 179412, 2012
WL 6627821, at *3 (D. Nev. Dec. 18, 2012).

(2) the claim must be one which arises out of or relates to the defendant's forum related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

"The plaintiff bears the burden of satisfying the first two prongs of the test." *Menken*, 503 F.3d at 1057.  If the plaintiff satisfies the first two prongs, the burden will shift to the defendant to show that exercising jurisdiction would be unreasonable. *Id.*  However, "[i]f the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.*  The Court's below discussion considers Ancestry's protestations that it did not purposefully direct its activities at Nevada and that Plaintiffs' claims are not related to Ancestry's activities in the forum.

### 1.  Purposeful Direction

When a plaintiff alleges claims sounding in tort, a defendant's minimum contacts are generally shown by the activities the defendant purposefully directed at the forum. *Schwarzenegger*, 374 F.3d at 802 (explaining that the purposeful direction formulation of the first element generally applies to tort claims, whereas the purposeful availment formulation applies to contracts).  To establish purposeful direction, plaintiffs generally present allegations of "defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at 803.  Courts evaluate purposeful direction under the three-part effects test articulated in *Calder v. Jones*, 465 U.S. 783 (1984).  The Ninth Circuit has explained:

> [Under] *Calder*, the "effects" test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.

*Id.* (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).

Here the parties do not dispute that Ancestry committed an intentional act by using Plaintiffs' names and images in Ancestry's promotional materials. (*See* MTD 6:4–7:7). However, Ancestry argues that Plaintiffs have not shown that it expressly aimed the act at Nevada because Ancestry.com is a universally accessible website that has only an incidental connection to Nevada residents. (*Id.* 6:4–7:1). Ancestry also argues that Plaintiffs have not shown Ancestry likely knew harm from the act would be suffered in Nevada. Ancestry argues that it knew Plaintiffs attended high school in Nevada, which does not indicate Ancestry knew Plaintiffs currently reside in Nevada. (*Id.* 7:2–7).

i. *Express Aiming at the Forum*

Generally, "[the] [e]xpress aiming . . . . requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *See Bancroft & Masters v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (sending a demand letter to a California citizen in Virginia expressly aimed conduct at California); *see, e.g.*, *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257 (9th Cir. 1989) (making defamatory statements in Canada about persons known to be Arizona citizens was expressly aimed at Arizona). Mere foreseeability of consequences in the forum is not sufficient. *See Schwarzenegger*, 374 F.3d at 804–05.

This case presents a difficult fact pattern: whether Ancestry, in operating an interactive website that can be viewed nationwide but contains materials allegedly infringing the publicity rights of millions of Nevada citizens, expressly aimed its conduct at Nevada. The Ninth Circuit has "struggled with the question whether tortious conduct on a nationally accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed." *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1229, *cert. denied*, 132 S. Ct. 1101, 181 L. Ed. 2d 979 (2012). Where the website owner "continually and deliberately exploit[s] the forum's market, which can be demonstrated by advertisements targeted at forum citizens,

and the market activities give rise to the action, exercise of jurisdiction is proper. *Id.* at 1230; *see also Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) ("'[O]ur inquiry boils down to this: has [defendant] purposefully exploited the [forum] market' beyond simply operating an interactive website accessible in the forum state and sending emails to people who may happen to live there?").

In the context of interactive websites, express aiming is often demonstrated through advertising. Where the defendant markets its website through local media in the forum, the defendant has expressly aimed its conduct at the forum. *See Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002). Direct advertising, however, is not necessary. If a third-party business places advertisements on the defendant's website, and the third-party targets the forum state with advertisements, courts may charge defendant with constructive knowledge that it has expressly aimed its conduct at the forum. *Mavrix Photo*, 647 F.3d at 1230. This is particularly true where the subject matter of the website has a close relationship with the forum, indicating that the defendant "anticipated, desired, and achieved a substantial [forum] viewer base." *Id.* A more limited jurisdictional approach would undermine the plaintiffs' interests in proceeding in their choice of forum and "would allow corporations whose websites exploit a national market to defeat jurisdiction in states where those websites generate substantial profits from local consumers." *Id.* at 1231.

Plaintiffs, Nevada citizens, allege that Ancestry has used their names and images within their subscription Yearbook Database and in advertisements thereof. (Compl. ¶¶ 2–4, 23–25, 35–37). When a limited-access user searches Plaintiffs' names on Ancestry's database, the prospective subscriber is shown Plaintiffs' names and images. (*Id.* 31–32, 42–43). If the user scrolls over the "View More" link on Plaintiffs' profiles or clicks links to information, they are shown an advertisement that encourages them to purchase an Ancestry subscription that will enable them to view more information about Plaintiffs. (*Id.*). Plaintiffs also allege that their

names and images are used in email promotional material that are sent to individuals whom Ancestry believes are acquainted with Plaintiffs. (*Id.* ¶¶ 12, 32, 44).

The question remains: did Ancestry expressly aim the above-described advertising activity at Nevada citizens?  Given the passage of time between the creation of the yearbooks to Ancestry's Database, Ancestry argues that it was merely foreseeable that the conduct would target Nevada citizens. (MTD 6:4–7:1, 7:8–24).  Given that persons who attended school in Nevada from 1900–1999 could now reside anywhere in the world, Ancestry contends it cannot be charged with knowledge that it aimed its activities at Nevada. (*Id.*).

The Court disagrees.  Plaintiffs allege that Ancestry's database includes 1.7 million individual records from yearbooks of Nevada schools. (Compl. ¶ 16).  Even if a substantial percentage of the individuals in Ancestry's database have moved from the state, it strains credulity that Ancestry would not know that, by creating a commercial database of many millions of Americans, over one million of whom went to school in Nevada, a substantial market for the database would be persons residing in Nevada.  Ancestry has sought to build a Database with nationwide appeal by allegedly collecting as many yearbooks as possible from across the country.  Ancestry intentionally targeted all fifty states in doing so. *Cf. Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984) (indicating that where a publisher cultivates a nationwide audience and can count on reaching consumers in all 50 states, it should be expected to be called into court in all 50 states where the elements of specific jurisdiction are otherwise satisfied).  Even if it does not have actual knowledge of the persons in its database who live in Nevada, Ancestry has targeted the Nevada market by appropriating the names, images, and likenesses of over one million Nevadans in its drive to create a nationwide database.

//

//

### ii.  *Harm Likely to be Suffered in the Forum*

Plaintiffs' right of publicity claim contends that Ancestry used Plaintiffs' likeness in contravention of their exclusive rights without providing any economic value for the use.  The allegation is sufficient to confer jurisdiction, particularly where at least the plurality of individuals interested in learning about Plaintiff likely reside in Nevada. *See Mavrix Photo*, 647 F.3d at 1231–32 ("It was foreseeable that this economic loss would be inflicted . . . in California.  A substantial part of the photos' value was based on the fact that a significant number of Californians would have bought publications such as *People* and *Us Weekly* in order to see the photos.").

### 2.  Relation

Ancestry contends that its contacts with the forum are unrelated to the action. (MTD 7:8–25).  It explains that its only connection with the forum is that Plaintiffs reside in the forum and the yearbooks originated in the forum. (*Id.* 7:12–14).  However, as the Court explains above, the action arises from Ancestry's use of Plaintiffs' names and images in order to promote its services, including to customers within the forum.  The connection demonstrates that Plaintiffs' cause of action arises from Ancestry's contacts with the forum.

### C.  **Affirmative Defenses**

Ancestry seeks dismissal of Plaintiffs' claims on the bases of several affirmative defenses.  Ancestry argues that § 230 of the Communications Decency Act ("Section 230") forecloses all of Plaintiffs' claims. (MTD 15:5–18:10).  Ancestry raises additional affirmative defenses only to Plaintiffs' right of publicity claims.  First, Ancestry argues that its use of Plaintiffs images is exempted from the Nevada Right of Publicity Statute on two bases: (1) the use is "not directly connected" with any commercial sponsorship; and (2) the use is in connection with public affairs. (*Id.* 11:22–15:4).  Second, Ancestry argues that the claim is preempted by the Copyright Act. (*Id.* 18:11–19).

In the analysis below, the Court is mindful that it may only grant a motion to dismiss a claim on the basis of an affirmative defense if, from the facts alleged in the complaint, there is no dispute that the affirmative defense would bar the claim. *See Asarco, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (explaining that the court should not grant a motion to dismiss on the basis of an affirmative defense if "from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact.").

### 1. Section 230

Ancestry argues that it is immune from liability under Section 230 because it is an "interactive computer service" that cannot be held liable for "information provided by another information content provider." (MTD 15:7–13) (quoting 47 U.S.C. § 230(c)(1)).  In *Barnes v. Yahoo!, Inc.*, the Ninth Circuit established a three-element test for defendants to demonstrate immunity under Section 230. 570 F.3d 1096, 1100 (9th Cir. 2009).  Immunity exists for, "(1) a provider or user of an interactive computer service[;] (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker[;] (3) of information provided by another information content provider." *Id.* at 1100–01.

An "interactive computer service" broadly includes "any information service . . .  that provides or enables computer access by multiple users to a computer server," which extends to all websites. 47 U.S.C. § 230(f)(2); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1268 (9th Cir. 2016). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).  Here, the parties agree that Ancestry is an interactive computer service that Plaintiffs seek to treat as a publisher or a speaker. (*See* Pls.' MTD Resp. 17:11–12).  However, the parties dispute whether the yearbook information was provided by "another information content provider." (*Id.* 17:19–18:28).  Plaintiffs also argue

that the affirmative defense does not apply based on the facts alleged in the Complaint because the authors of the yearbook material did not intend the work be published on the internet. (*Id.* 16:16–17:18).

i.   *Ancestry as Information Content Provider*

Section 230 only immunizes interactive computer services against claims arising from information provided by "another" interactive computer service, meaning that the interactive computer service is not immune where it is "'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (quoting 47 U.S.C. § 230(f)(3)). In other words, Section 230 "protects websites from liability [under state or local law] for material posted on the[ir] website[s] by someone else." *Dyroff v. Ultimate Software Grp., Inc.* 934 F.3d 1093, 1097 (9th Cir. 2019) (internal modifications original) (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).

Based on the facts alleged in the Complaint, Ancestry is not immune under Section 230 because it was responsible for posting the information in its database. The Complaint alleges that Ancestry has gathered millions of persons' personal information through individual records, including many donated yearbooks, which Ancestry has used to build its database. (Compl. ¶¶ 46–50). Accordingly, while the yearbook publishers originated the content that Ancestry used to create its database, and the yearbooks were provided by third parties, Ancestry alone is responsible for posting the material on its website after it receives the records from others. Section 230 immunity therefore does not attach.

ii.   *Intent of Yearbook Publishers*

Even if the Section 230 immunity would otherwise apply, the Court cannot grant dismissal based on the facts alleged in the Complaint because it is unclear whether the yearbook providers—the "information content providers" who are "responsible . . . for the

creation or development" of the yearbooks—consented to the information's publication on the internet. In *Batzel v. Smith*, a handyman emailed the Museum Security Network to report that he believed the plaintiff, his client, had stolen artwork in her home. 333 F.3d 1018, 1020–21 (9th Cir. 2002) (superseded in part by statute), *cert. denied*, 541 U.S. 1085 (2004). The handyman had no indication that the email recipient would publish his correspondence, but the recipient nevertheless published it to an email listserv of "hundreds of museum security officials, insurance investigators, and law enforcement personnel around the world." *Id.* at 1021–22. Plaintiff brought suit against both the handyman and the administrator of the listserv, and the administrator brought an anti-SLAPP motion to strike, arguing he was immune from liability under Section 230. *Id.* at 1023. While the Ninth Circuit concluded that the administrator established the elements of Section 230 immunity, the immunity did not attach because "[i]f information is provided to those individuals in a capacity unrelated to their function as a provider or user of interactive computer services, then there is no reason to protect them with the special statutory immunity." *Id.* at 1033. Here, the Court must therefore consider whether Ancestry "knew or had reason to know that the information provided was not intended for publication on the Internet." *Id.* at 1034.

Here, the yearbook publishers, not those who sent Ancestry yearbooks, are the relevant information content providers. Those who sent Ancestry yearbooks are not "responsible, in whole or in part, for the creation or development of [the yearbooks] provided through the Internet. . . ." 47 U.S.C. § 230(f)(3). If Ancestry received the yearbooks comprising its database from the publisher, it may well be immune. However, the mere existence of the hard copy yearbooks does not indicate that the publishers "provided" the yearbooks for publication on the internet. As the *Batzel* court explained in dicta, "One would not say, for example, that the author of a magazine article 'provided' it to an interactive computer service provider or user by allowing the article to be published in hard copy off-line." 333 F.3d at 1032–33. The Court

therefore finds that dismissal based upon Section 230 would be premature at the 12(b)(6) stage even if Ancestry had otherwise shown the immunity applies.

### 2.  Right of Publicity Statutory Exemption

The Nevada Right of Publicity Statute codifies "a right of publicity in the name, voice, signature, photograph, or likeness of every person." NRS 597.790(1).  The statute regulates the "commercial use" of an another's likeness, which includes, "the use of the name, voice, signature, photograph or likeness of a person on or in any product, merchandise or goods or for the purposes of advertising, selling or soliciting the purchase of any product, merchandise, goods or service." NRS 597.770(1).

Under the statute, "[a]ny commercial use by another of the name, voice, signature, photograph or likeness of a person requires the written consent of that person[.]" NRS 597.790(2).  However, the statute contains several exceptions, two of which Ancestry raises in its Motion.  First, Ancestry contends its use of Plaintiffs' names and images "is contained in material which is commercially sponsored but the use is not directly connected with the commercial sponsorship." (MTD 11:22–12:19) (quoting NRS 597.790(2)(a)).  Second, Ancestry argues that its use is "in connection with . . . public affairs[.]" (*Id.* 12:20–15:4) (quoting NRS 597.790(2)(c)).  The Court's below discussion addresses the applicability of each affirmative defense.

#### i.  *Commercial Sponsorship*

Ancestry argues that its use of Plaintiffs' names and images is not "directly connected" with commercial sponsorship because the use is incidental to any commercial sponsorship. (MTD 11:23–12:19).  Relying on *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 693–94 (9th Cir. 1998), Plaintiffs respond that the applicability of the defense presents a question of fact that is not suitable for resolution on a motion to dismiss. (Pls.' MTD Resp. 12:4–26).

No Nevada cases have interpreted the right of publicity exemption for use "contained in material which is commercially sponsored but [where] the use is not directly connected with the commercial sponsorship."  However, California's right of publicity statute has a nearly identical exception, and Nevada courts look to California law where Nevada law is silent. *See* Cal. Civ. Code § 3344(e); *Comm. Standard Ins. Co. v. Tab Constr., Inc.*, 583 P.2d 449, 451 (Nev. 1978).  The Ninth Circuit considered California's corollary defense in *Newcombe*.

In *Newcombe*, defendants used a drawing of plaintiff, a former major league baseball pitcher, in a full-page advertisement for Killian's Irish Red Beer without plaintiff's consent. 157 F.3d at 689.  The left side of the page featured a drawing of plaintiff in his recognizable windup position in a scene of an old-time baseball game, and the right side included advertising copy and pictured a glass of beer. *Id.*  The district court concluded that plaintiff could not assert a right of publicity claim because, under the same affirmative defense as presented in the case at bar, plaintiff "had failed to establish a direct connection between the use of his likeness and defendants' commercial purpose," and "it [was] beyond dispute that defendants were not trying to use plaintiff's identity to sell beer." *Id.* at 693–94 (internal quotations omitted).  The Circuit reversed, explaining that the existence of a direct connection is a question of fact, and "[i]t would not be unreasonable for a jury to conclude that there was a direct connection between Newcombe, as the central feature of the advertisement, and the commercial sponsorship of Killian's Red." *Id.* at 694.

While *Newcombe* identifies the "direct connection" as a question of fact, the conclusion does not render dismissal inappropriate in all cases.  *Newcombe* presented a touchstone example for the violation of one's publicity rights: a recognizable public figure's likeness was used in an advertisement to promote a product.  The district court erroneously concluded that, despite plaintiff's presence as the sole recognizable figure in the advertisement, a jury could not have concluded that his image was directly connected to the commercial sponsorship of the

product advertised.  But where, as here, many millions of persons' names and images are used within Ancestry's subscription products and in promotional emails, Ancestry argues that its use is not "direct," but incidental.

As an example of incidental use of one's likeness, Ancestry directs the Court to *D'Andrea v. Rafla-Demetrious*, 972 F. Supp. 154 (E.D.N.Y. 1997).  In *D'Andrea*, a former medical resident brought suit against a hospital that included his image in a brochure promoting the hospital's residency programs. *Id.* at 155.  The plaintiff was one of 42 people who appeared in the brochure's photographs. *Id.* at 156.  Following trial, the district court concluded as a matter of law that the hospital's use of plaintiff's image was incidental to the purpose of the main document—providing information about the hospital's residency programs. *Id.* at 157.

Although *D'Andrea* concerns the use of many photos within one publication, its efficacy as an analogy to this case is limited because of dissimilarities of both fact and law.  First, cases interpreting New York's right of publicity statute require a "direct and substantial connection between the appearance of the plaintiff's name or likeness and the main purpose and subject of the work." *Id.* at 157 (internal citations and quotations omitted).  While the Court could read the same "incidental use doctrine" into the Nevada statute, the limitation is much narrower than the Nevada statutory text, and the Court declines to do so without either applicable precedent or certifying the question to the Nevada Supreme Court.  Second, the plaintiff's picture provided no value to the brochure because his image was completely unrecognizable to the brochure's intended audience. *Id.*  His image would have been fungible with that of a stock photo of the doctor.  Therefore, his image's use in the pamphlet provided no intrinsic value to the pamphlet itself.  Here, however, the value of Ancestry's Yearbook Database derives exclusively from prospective customers' interest in the persons whose images are depicted.

The affirmative defense does not apply to Plaintiffs claims regarding the use of their names and images in targeted promotional emails.  Plaintiffs allege that Ancestry has sent

emails to prospective customers that are likely acquainted with Plaintiffs. (Compl. ¶¶ 12, 32, 44). Plaintiffs further allege that the emails invite the recipients to purchase Ancestry subscriptions to learn more about Plaintiff. (*Id.*). Based on the facts described, Plaintiffs have plausibly alleged that Ancestry's use of their names and images are directly connected to Plaintiffs' advertising of their services.

While a closer case, the Court also finds that the claims premised upon Ancestry's use of Plaintiffs' names and images within the trial access are sufficiently alleged at this stage of the proceedings to survive dismissal. Plaintiffs' names and images are allegedly contained within Ancestry's Yearbook Database. (Compl. ¶¶ 29, 37). If a prospective subscriber searches for Plaintiffs' names and tries to click through to their information, a limited access user is presented with an advertisement to purchase a subscription. (*Id.* 31–32, 42–43). The advertising pattern indicates that Ancestry is trading off the value of customers searching for Plaintiffs' names in order to entice them into purchasing a subscription. Similarly, free-trial subscribers are expected to convert to paid users if their searches generate sufficient value to the trial subscriber to motivate them to pay for a subscription. (*Id.* 32, 43). While, Plaintiffs' images are few among many within the database, the images are what gives Ancestry's service value. Accordingly, based on the facts alleged, a jury could ultimately conclude that Ancestry's use of Plaintiffs' names and images is directly connected to Ancestry's commercial sponsorship. The Court therefore denies dismissal upon the commercial sponsorship statutory exemption.

### ii. *Public Affairs*

Ancestry contends its use of Plaintiffs' names and images is exempt from liability because it is "in connection with . . . public affairs." (MTD 12:21–15:4) (quoting NRS 597.790). Ancestry attempts to expand the understanding of public affairs from reporting on events and public persons to anything that may interest private individuals. (*Id.*).

Even if Plaintiffs are of interest to the limited public searching for Plaintiffs'
information, Ancestry's use of their likenesses in connection with advertising is not within the
scope of "public affairs." (MTD 13:11–14:12); *cf. Fraley v. Facebook*, 830 F. Supp. 2d 785,
805 (N.D. Cal. 2011) (explaining that even if Facebook users' "likes" are in the public interest
among an audience of their friends, Facebook's publication thereof was for commercial
purposes, not the public interest).  As the use is for commercial purposes, the Court finds that
Ancestry has not shown, based on the facts alleged in the Complaint, that its use of Plaintiffs'
names, images, and likeness is in connection with public affairs.

### 3.  Right of Publicity Copyright Preemption

Ancestry argues that Plaintiffs' right of publicity claim is preempted by the federal
Copyright Act. (MTD 18:11–19:28).  Section 301 of the Copyright Act expressly preempts
state common law rights and statutes that "'are equivalent to copyright and that extend to
works,' so long as the rights fall 'within the scope of the Federal copyright law.'" *Maloney v.
T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017) (quoting H.R. Rep. No. 94-1476, at 130
(1976)); *see also* 17 U.S.C. § 301(a).  Courts within the Ninth Circuit employ a two-step test to
determine if the Copyright Act preempts a state-law claim.  "First, we decide 'whether the
'subject matter' of the state law claim falls within the subject matter of copyright as described
in 17 U.S.C. §§ 102 and 103.'" *Id.* at 1010 (quoting *Laws v. Sony Music Entm't, Inc.*, 448 F.3d
1134, 1137 (9th Cir. 2006).  "Second, assuming it does, we determine 'whether the rights
asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which
articulates the exclusive rights of copyright holders.'" *Id.*

Here, the parties agree that Ancestry's use satisfies the second step because Ancestry
reproduces Plaintiffs' photographs. (*See* MTD 18:11–19:19) (addressing only whether the
subject matter of Plaintiffs' claim is within the scope of Copyright law).  However, the parties
dispute whether the subject matter of Plaintiffs' claim falls within the scope of the Copyright

Act.  Ancestry argues that Plaintiffs' claim falls within the scope of the Act because it seeks to remedy the display of Plaintiffs' photographs on the Yearbook Database. (*Id.*).  Plaintiffs argue that copyright preemption does not apply where the defendant does not own the claimed copyright, and Plaintiffs' claims to exclusive rights in their likenesses fall outside the scope of the Copyright Act. (Pls.' MTD Resp. 19:1–20:7).

Plaintiffs' first contention is incorrect.  The defendant need not own the copyright at issue for copyright preemption to apply. *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1154–55 (9th Cir. 2010) ("Whether a claim is preempted under Section 301 does not turn on what rights the alleged infringer possesses, but on whether the rights asserted by the plaintiff are equivalent to any of the exclusive rights within the general scope of the copyright.").  Whether Plaintiffs' claim arise within the subject matter of the Copyright Act merits a longer discussion.

In *Downing v. Abercrombie & Fitch*, plaintiffs, two champion surfers, brought a right of publicity claim against the clothing retailer Abercrombie & Fitch (A&F) for using a photograph of plaintiffs, bearing their names, in a subscription catalog. 265 F.3d 994, 999–1000 (9th Cir. 2001).  The catalog employed a "surfing theme," and A&F, without permission, used a photograph of plaintiffs from the 1965 Makaha International Surf Championship in Hawaii; the photographer had also written Plaintiffs' names at the bottom of the photograph. *Id.*  A&F also created t-shirts exactly like those worn by Plaintiffs in the photograph marketed as "Final Heat Tees," which A&F offered for sale in the same catalog. *Id.* at 1000.  A&F displayed the shirts one-page after Plaintiffs' photograph. *Id.* at 1000.

The Ninth Circuit concluded that the photograph itself, as a pictorial work of authorship, fell within the scope of the Copyright Act. *Id.* at 1003.  The court nevertheless concluded that the subject matter of Plaintiffs' claim did not fall within the scope of the Act because it was not the use of the picture—but rather plaintiffs' likenesses and names—that underpinned Plaintiffs'

claims. *Id.*  Put differently, plaintiff sought to challenge A&F's use of Plaintiffs' "personas," not just the publication of their image. *Id.*at 1003–04.  The Court explained that while plaintiffs' "names and likenesses are embodied in a copyrightable photograph," they did not raise a claim within the scope of the Act because "[a] person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. § 102." *Id.* at 1004.  *Downing* nevertheless left ambiguous how a court determines if a right of publicity claim regarding a photograph concerns the plaintiff's name and image or if it is merely an attempt to plead around copyright preemption.

The Circuit clarified the relationship between right of publicity claims and copyright preemption in *Maloney v. T3Media, Inc.*, 853 F.3d 1004 (9th Cir. 2017).  In *Maloney*, defendant hosted an online photo library of photographs it licensed from the NCAA. *Id.* at 1107.  The database displayed thumbnails of the photos accompanied by brief descriptions of the images depicted. *Id.*  Defendant sold limited licenses to customers that would allow the customers to download a copy of the photographs. *Id.* at 1107–08.  Included within the photo library were pictures taken of plaintiffs, two former basketball players at Catholic University ("CU"), from CU's Division III national championship victory over William Patterson University. *Id.* at 1007.  Plaintiffs sued T3Media for violating their right of publicity, and T3Media prevailed before the district court on its Anti-SLAPP motion to strike, which argued that the Copyright Act preempted plaintiffs' claim. *Id.* at 1008–09.

The Circuit noted that, "[t]he right of publicity seeks to prevent commercial exploitation of an individual's identity without that person's consent." *Id.* at 1010.  To analyze whether a claim is directed toward the appropriation of one's identity, the court explained:

> our cases clarify that a publicity-right claim may proceed when a likeness is used non-consensually on merchandise or in advertising.  But where a likeness has been captured in a copyrighted artistic visual work and the work itself is being distributed for personal use, a publicity-right claim is little more than a thinly

disguised copyright claim because it seeks to hold a copyright holder liable for exercising his exclusive rights under the Copyright Act.

*Id.* at 1016.  The court explained that, "the crux of the issue is thus deciding when a publicity-right claim seeks to vindicate misuse of an individual's likeness, as opposed to merely interfering with the distribution, display, or performance of a copyrighted work." *Id.* at 1012–13.  Given the plaintiffs' claims "d[id] not contend that their likenesses were ever used on merchandise or in advertising" but instead contested only "the copyright holder's decision to distribute the copyrighted images themselves," the claim was preempted. *Id.* at 1011.

Here, Plaintiffs' claims concern Ancestry's use of Plaintiff's likeness, not merely their publication of Plaintiffs' photographs.  Unlike in *Maloney*, Ancestry does not merely offer a repository of photos that customers may download for purely personal use.  Rather, Ancestry advertises its subscription services by offering prospective customers the ability to learn about persons within the Database.  For example, when free trial users scroll over links to information about a person, they are told, "[t]here's more to see" about each person through a pop-up advertisement. (Compl. ¶¶ 31, 43).  Likewise, Ancestry allegedly sends emails bearing Plaintiffs' likenesses to persons Ancestry believes know Plaintiff, again trading on customers' curiosity about Plaintiffs and not their mere desire to view photographs of Plaintiffs.  As *Downing* and *Maloney* explain, the distinction indicates that Ancestry uses Plaintiffs' personas to their commercial advantage rather than merely displaying or publishing photographs depicting Plaintiffs.  Where, as here, the platform containing a plaintiff's photograph sells information about the plaintiff and not limited rights to his image alone, the Copyright Act will not preempt a claim concerning the use of the image.  Therefore, the Court concludes that the Complaint does not establish copyright preemption of Plaintiffs' right of publicity claim.

//

//

### D.   Deceptive Trade Practices

Under NRS 598.0915(2)–(3), a "deceptive trade practice" is committed by one who: (1) "[k]nowingly makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease[;]" or (2) "[k]nowingly makes a false representation as to affiliation, connection, association with or certification by another person." The Complaint does not allege any knowingly false representations Ancestry made regarding the source, sponsorship, or approval of their subscription services or Plaintiffs' affiliation, connection, association with, or certification thereof.  Plaintiffs have not alleged facts indicating that Ancestry falsely represented Plaintiff's approval of or affiliation with Ancestry's services.  Accordingly, the Court dismisses the claim without prejudice.

### E.   Intrusion Upon Seclusion

The tort of intrusion upon seclusion is "grounded in a plaintiff's objective expectation of privacy." *Franchise Tax Bd. of State of California v. Hyatt*, 407 P.3d 717, 734 (Nev. 2017), *rev'd on other grounds Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485 (2019).  "To recover for the tort of intrusion, a plaintiff must prove the following elements: 1) an intentional intrusion (physical or otherwise); 2) on the solitude or seclusion of another; 3) that would be highly offensive to a reasonable person." *People for Ethical Treatment of Animals (PETA) v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1279 (Nev. 1995), *overruled on other grounds by City of Las Vegas Downtown Redev. Agency v. Hecht*, 940 P.2d 127 (Nev. 1997).

"While what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court . . . ." *Id.* 1281–82 (citation omitted).  Whether "conduct will be regarded as a 'highly offensive' intrusion is largely a matter of social conventions and expectations." *Kuhn v. Account Control Tech., Inc.*, 865 F. Supp. 1443, 1449 (D. Nev. 1994) (citation omitted).  Courts look to "the degree of intrusion, the context, conduct and

circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Id.*

Plaintiffs claim that they have a reasonable expectation of privacy in their photographs and biographical details, but the allegation is an unwarranted legal conclusion. (Compl. ¶ 83). "[A] defendant cannot be liable for disclosing information about a plaintiff that was already public." *Franchise Tax Bd.*, 407 P.3d at 734. Plaintiffs argue that they retain a reasonable expectation of privacy in the information because they only intended it to be accessible by family and classmates. (Pls.' MTD Resp. 21:15–26) (citing *In re Facebook*, 402 F. Supp. 767, 782 (N.D. Cal. 2019)). Even if Plaintiffs have a reasonable expectation of privacy in the information, Plaintiffs have not alleged sufficient facts indicating that Ancestry's publication of these photos of Plaintiffs would be highly offensive to a reasonable person. The Court therefore dismisses the claim without prejudice.

### F.   Unjust Enrichment

To prevail on their unjust enrichment claim under Nevada common law, Plaintiffs must show Ancestry "has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mortg. & Equity Trust v. McDonald*, 626 P.2d 1272, 1273 (1981) (citation omitted). The Nevada Supreme Court has instructed that, as a counterpart of the doctrine of quasi-contract, the essential elements of such a claim are (1) "a benefit conferred on the defendant by the plaintiff"; (2) "appreciation by the defendant of such a benefit"; and (3) "acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Id.* at 1273 (citation omitted).

Plaintiffs have not alleged that they conferred a benefit upon Ancestry. Rather, they allege that Ancestry received their photos and information from third parties. Accordingly, unjust enrichment is inapplicable, and the Court dismisses the claim with prejudice.

### G.      Anti-SLAPP Motion to Strike

A district court analyzing a special motion to dismiss under Nevada's anti-SLAPP statute engages in a two-step analysis. Nev. Rev. Stat. § 41.660(3).  First, the court "[d]etermine[s] whether the moving party has established, by a preponderance of the evidence, that the claim is based upon a good faith communication in furtherance of . . . the right to free speech in direct connection with an issue of public concern." *Id.* § 41.660(3)(a).  If the moving party fails to carry its burden at this first step, the inquiry ends and the case advances to discovery. *Coker v. Sassone*, 432 P.3d 746, 748 (Nev. 2019).  If the moving party succeeds, however, the court advances to the second step.  There, the burden shifts to the non-moving party to show "with prima facie evidence a probability of prevailing on the claim[s]." Nev. Rev. Stat. § 41.660(3)(b); *Coker*, 432 P.3d at 748.  If the non-moving party fails to satisfy its burden on the second step, the court dismisses the action. *See id.* § 41.660(5).

The first step of Nevada's anti-SLAPP analysis holds two components: (1) determining if the non-moving party's claims for relief are based on a "communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern"; and, if so, (2) determining if such communication was in "good faith." *Id.* § 41.660(3)(a).

Here, for the reasons described in the Court's discussion of the right of publicity public affairs exception, the Court finds that the challenged advertising communications do not implicate matters of public concern.  Accordingly, the Court denies Ancestry's request to strike the Complaint under Nevada's anti-SLAPP law.

//

//

//

//

//

IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that Ancestry's Motion to Dismiss, (ECF No. 19), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Ancestry's Motion for Leave to File, (ECF No. 32), is **GRANTED**.

**IT IS FURTHER ORDERED** that Ancestry's Motion for Leave to File, (ECF No. 33), is **GRANTED**.

Dated this 16 day of September, 2021.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT