Cohen-Johnson, LLC
  H. Stan Johnson, Esq.
  (sjohnson@cohenjohnson.com)
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89119
Telephone:     (702) 823-3500
Facsimile:     (702) 823-3400

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (*Pro Hac Vice*)
  (shonmorgan@quinnemanuel.com)
  John W. Baumann (*Pro Hac Vice*)
  (jackbaumann@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

  Cristina Henriquez (*Pro Hac Vice*)
  (cristinahenriquez@quinnemanuel.com)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5000

Attorneys for ANCESTRY.COM
OPERATIONS INC., ANCESTRY.COM INC.,
and ANCESTRY.COM LLC

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ANTHONY SESSA and MARK SESSA, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>ANCESTRY.COM OPERATIONS INC., a Virginia Corporation; ANCESTRY.COM, INC., a Delaware Corporation; ANCESTRY.COM LLC, a Delaware Limited Liability Company; and DOES 1 through 50, inclusive,<br><br>                Defendants. | Case No.: 2:20-cv-02292-GMN-BNW<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...............................................................................................................3

LEGAL STANDARD.........................................................................................................7

ARGUMENT......................................................................................................................7

I.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW
COMMONALITY, TYPICALITY OR PREDOMINANCE AMONG
LIABILITY ISSUES .................................................................................................7

        A.    The Alleged "Commercial Use" And "Injury" Differ From Record To
Record And Plaintiffs' Records Were Not Subject To The Alleged
"Commercial Use"...............................................................................9

        B.    Even As To Those Instances of a Challenged Use, Plaintiffs Concede
Recognizability Of The Subjects Requires Individual Assessments .................15

        C.    Plaintiffs Cannot Offer A Common Answer To Whether Any Alleged
Commercial Use Occurred In Nevada, And Their Own Claims Are
Atypical............................................................................................19

        D.    Whether Any Alleged Use Was "Directly Connected with Commercial
Sponsorship" Differs Depending On User Engagement And Plaintiffs Are
Not Typical Of Those Whose Records They Contend Were "Directly
Connected".........................................................................................21

        E.    Whether Any Alleged Use Related To Public Affairs Will Differ
Depending On The Subject Of The Record ............................................22

II.    PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW
COMMONALITY, TYPICALITY OR PREDOMINANCE AMONG
DAMAGES ISSUES ...............................................................................................25

        A.    Actual Damages Are Required And Cannot Be Established Classwide,
And Plaintiffs Are Not Typical Of Those Who Can Prove Actual Damages........26

        B.    Plaintiffs' Damages Model Is Untethered To Their Liability Theory ..................28

        C.    Even Could Plaintiffs Proceed Without Proof Of Actual Damages, They
Have Failed To Demonstrate Damages Are Measurable Classwide ...................28

III.    PLAINTIFFS' PROPOSED TRIAL PLAN IS UNWORKABLE AND, AS A
RESULT, PLAINTIFFS HAVE FAILED TO DEMONSTRATE THIS CASE IS
MANAGEABLE AS A CLASS ACTION ..............................................................31

IV.    PLAINTIFFS CANNOT CERTIFY A CLASS UNDER RULE 23(B)(2) WHEN
THEY SEEK DAMAGES FOR EACH CLASS MEMBER..............................................34

CONCLUSION................................................................................................................34

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aburto v. Verizon California, Inc.*,
   2012 WL 10381 (C.D. Cal. Jan. 3, 2012) ...............................................9, 14, 19, 25

*Alberghetti v. Corbis Corp.*,
   263 F.R.D. 571 (C.D. Cal. 2010) ...............................................................33, 34

*Bilotta v. Citizens Info. Assocs., LLC*,
   2014 WL 2050853 (M.D. Fla. May 19, 2014) ..................................................27

*Boshears v. PeopleConnect, Inc.*,
   2022 WL 888300 (W.D. Wash. Mar. 25, 2022) ...............................................19

*Chambers v. Time Warner*,
   2003 WL 749422 (S.D.N.Y. Mar. 5, 2003) ......................................................12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)..................................................................7, 25, 26, 28

*Cruz v. Lawson Software, Inc.*,
   2010 WL 890038 (D. Minn. Jan. 5, 2010) .......................................................20

*Dancel v. Groupon, Inc.*,
   949 F.3d 999 (7th Cir. 2019) .............................................................2, 18, 19

*Doyle v. Chrysler Grp., LLC*,
   663 Fed. App'x 576 (9th Cir. 2016) ................................................................25

*Eisen v. Carlisle & Jacquelin*,
   479 F.2d 1005 (2d Cir. 1973) ...................................................................30, 31

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
   688 F. Supp. 2d 1148 (D. Nev. 2010) .............................................................19

*FilmOn.com Inc. v. DoubleVerify Inc.*,
   7 Cal. 5th 133 (2019) ....................................................................................23

*Fischer v. InstantCheckmate LLC*,
   2022 WL 971479 (N.D. Ill. Mar. 31, 2022) .........................................3, 13, 14, 18, 21

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................................26

*Gionfriddo v. MLB*,
   94 Cal. App. 4th 400 (2001) .....................................................................21, 22

*Gonzales v. Comcast Corp.*,
   2012 WL 10621 (E.D. Cal. Jan. 3, 2012) .........................................................26

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Gutierrez v. Wells Fargo & Co.*,
  2009 WL 1247040 (N.D. Cal. May 5, 2009) ............................................................ 30

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .................................................................................... 8

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ......................................................................... 8, 12, 15

*Herskowitz v. Apple, Inc.*,
  301 F.R.D. 460 (N.D. Cal. 2014) ............................................................................. 34

*Hetter v. Eighth Jud. Dist. Ct. of State In & For Cnty. of Clark*,
  110 Nev. 513 (1994) ............................................................................................ 27, 28

*Hilao v. Estate of Marcos*,
  103 F.3d 767 (9th Cir. 1996) ............................................................................. 30, 31

*Huebner v. Radaris, LLC*,
  2016 WL 8114189 (N.D. Cal. Apr. 12, 2016) ........................................................... 3

*Huston v. Hearst Communications, Inc.*,
  53 F.4th 1097 (7th Cir. 2022) .................................................................................. 14

*In re Facebook, Inc., PPC Advert. Litig.*,
  282 F.R.D. 446 (N.D. Cal. 2012) ............................................................................. 11

*In re Hotel Tel. Charges*,
  500 F.2d 86 (9th Cir. 1974) ...................................................................................... 30

*In re SFPP Right-of-Way Claims*,
  2017 WL 2378363 (C.D. Cal. May 23, 2017) .......................................................... 32

*In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*,
  2008 WL 3179315 (D. Nev. June 20, 2008) ............................................................... 8

*Jones v. Corbis Corp.*,
  815 F. Supp. 2d 1108 (C.D. Cal. 2011) ................................................................. 3, 23

*Knapke v. PeopleConnect Inc.*,
  553 F. Supp. 3d 865 (W.D. Wash. 2021) ................................................................. 13

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 3d 1292 (D. Nev. 2014) ........................................................................ 33

*Lightbourne v. Printroom Inc.*,
  307 F.R.D. 593 (C.D. Cal. 2015) ................................................................... 3, 22, 27

*Lilly v. Jamba Juice Co.*,
  2014 WL 4652283 (N.D. Cal. Sept. 18, 2014) ........................................................ 33

*Maloney v. T3Media, Inc.*,
  853 F.3d 1004 (9th Cir. 2017) ............................................................................. 9, 10

*Martinez v. Brown*,
  2011 WL 1130458 (S.D. Cal. Mar. 25, 2011) ............................................................... 7

*McBee v. Delica Co.*,
  417 F.3d 107 (1st Cir. 2005) ....................................................................................... 20

*Montana v. San Jose Mercury News, Inc.*,
  34 Cal. App. 4th 790 (1995) ........................................................................................ 23

*Motschenbacher v. R. J. Reynolds Tobacco Co.*,
  498 F.2d 821 (9th Cir. 1974) ....................................................................................... 11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .................................................................................... 7, 11

*Opperman v. Kong Techs., Inc.*,
  2017 WL 3149295 (N.D. Cal. July 25, 2017) ............................................................. 28

*Patel v. Facebook, Inc.*,
  932 F.3d 1264 (9th Cir. 2019) ..................................................................................... 20

*Schwartz v. Upper Deck Co.*,
  183 F.R.D. 672 (S.D. Cal. 1999) ................................................................................... 7

*Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ..................................................................................................... 32

*Sidibe v. Sutter Health*,
  333 F.R.D. 463 (N.D. Cal. 2019) ................................................................................ 30

*Siegel v. ZoomInfo Techs. LLC*,
  2021 WL 4306148 (N.D. Ill. Sept. 22, 2021) ............................................................. 14

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) ....................................................................................... 32

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..............................................................7, 9, 11, 14, 19, 25, 34

*Wetzel v. CertainTeed Corp.*,
  2019 WL 3976204 (W.D. Wash. Mar. 25, 2019) .................................................. 31, 33

*Zinser v. Accufix Rsch. Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ..................................................................................... 31

## Statutes

Nev. Rev. Stat. § 597 ................................................3, 11, 12, 14, 19, 21, 23, 26, 28, 32

## Rules

Fed. R. Civ. P. 23 ..............................................................7, 8, 9, 11, 31, 32, 34

1

## **PRELIMINARY STATEMENT**

2  Ancestry's concurrent motion for summary judgment shows it never used plaintiffs' information

3 in the ways they challenge.  Granting that motion would moot plaintiffs' request to certify a sprawling,

4 highly-diverse and judicially unmanageable class that seeks nearly $1 billion in damages based on

5 Ancestry's provision of access to decades-old and already-public high school yearbook records.  Should

6 the Court find it necessary to consider plaintiffs' certification request, the record demonstrates that the

7 tenuous theories plaintiffs advanced to avoid dismissal of their right of publicity claim are entirely

8 incompatible with class treatment.

9  Faced with multiple statutory and constitutional bars to their claims as broadly pleaded (and that

10 resulted in rejection of most of their claims and theories at the pleading stage), plaintiffs now seek to

11 certify based on challenges to three narrow uses of indisputably public information: (1) search results

12 that might be displayed to non-paying users, (2) access to yearbook records as part of Ancestry's two-

13 week "free trial" program, and (3) delivery of "hint" emails to non-paying, registered users (which

14 provide information for records in which a specific user might be interested).

15  But these theories are still subject to the same defenses, and the narrowing serves simply to

16 highlight the fact-intensive inquiries not susceptible to common answers on the central liability

17 questions.  Whether any class member's yearbook record appeared in one of these forms—and thus

18 whether any "commercial use" and "injury" even conceivably occurred—will differ from record to

19 record depending on whether a non-paying user ever searched for, viewed, or received a hint for that

20 record.  Absent such user interaction, the "advertisements" plaintiffs challenge *do not exist*.  Although

21 plaintiffs bear the burden to demonstrate class treatment is appropriate, they have not offered evidence

22 that *any* putative class member's yearbook information was ever included in one of the purported

23 "advertisements," nor any means by which that central liability and injury determination could be made

24 absent a record-by-record inquiry.  Moreover, without user engagement *in Nevada*, the challenged

25 "commercial use" did not occur *in Nevada* and thus falls outside the statute's express territorial

26 limitations.  Likewise, whether a class member is *identifiable* in the alleged use—a required showing

27 for any misappropriation of *identity* claim—will differ depending on the content of each record.

28

Indeed, plaintiffs admitted they could not identify whether *their own likenesses even appeared* in several purported "advertisements" they challenge.

In addition to the disparate answers to these purportedly common central questions, resolving the merits of each class member's claim cannot be accomplished "in one stroke" and would instead entail a host of other individual inquiries for each of the 2,654,270 records plaintiffs contend are at issue. For example, Nevada's statute expressly exempts use that is "not directly connected with the commercial sponsorship." In assessing this issue at the dismissal stage, the Court found this raised a "closer case" for the alleged "previews" than "hint" messages, but allowed the claims to proceed based on allegations plaintiffs' records had *actually been previewed* to non-paying users. But plaintiffs concede this is not true of each of the millions of records they contend are at issue (indeed, their own were not). The "connection" with "commercial sponsorship" necessarily differs for an unviewed record amongst millions of others (like plaintiffs') and a record purportedly sent to a user as the subject of a "hint" email, yet plaintiffs have offered no means by which class members in either category could be distinguished. Likewise, although plaintiffs protested that their *own* records are not subject to the statute's exclusion for use in connection with "public affairs," absent record-by-record assessment, there is no way to resolve this question for each of the millions of records, certain of which reflect, for example, high schools commemorating alumni Presidents' inaugurations, the appointment of Supreme Court Justices, and other public figures engaging in activities of interest to the public. These and other issues abound and, if certified, this action would deprive Ancestry of its right to defend itself against the claims of individual class members. Indeed, it is precisely for these reasons that courts *routinely* refuse to certify similar "right of publicity" class actions.[1] The same result should follow here and plaintiffs' motion should be denied.

---

[1] Plaintiffs' assertion they "are unaware of any court that has denied class certification in a similar case" begs the question how hard they bothered to look. *See, e.g.*, *Dancel v. Groupon, Inc.*, 949 F.3d 999 (7th Cir. 2019) (affirming denial of certification in similar right of publicity case); *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1117 (C.D. Cal. 2011), *aff'd*, 489 F. App'x 155 (9th Cir. 2012) (denying certification of similar right of publicity claim); *Lightbourne v. Printroom Inc.*, 307 F.R.D. 593, 604 (C.D. Cal. 2015) (same); *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 582 (C.D. Cal. 2010) (same); (footnote continued)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## BACKGROUND

**Plaintiffs' Claims.**   Brothers Anthony and Mark Sessa filed a putative class action against Ancestry based on Ancestry's alleged use of their yearbook records.  *See generally* ECF No. 1.  They are left only with a single claim for violation of their right of publicity under Nevada Revised Statute §§ 597.770 *et seq*.  *Id.*  Plaintiffs concede they "have no objection to the distribution of their yearbooks." *Sessa v. Ancestry*, Case No. 21-16618 (9th Cir.), ECF No. 16 at 16.  Instead, their claims are premised on three alleged "uses" of records in a manner plaintiffs claim are "advertisements."

*First,* plaintiffs allege visitors to Ancestry's site who are not paying subscribers and have not enrolled in a "free trial" can "search for records in Ancestry's Yearbook [Database] and may view a limited portion of the information in those records."  ECF No. 1 at ¶¶ 29-31, 41-43.  Plaintiffs contend the results of such a search lead to "promotional pop-up advertisement[s]" prompting the user to "'Sign Up Now' for a paid subscription."  *Id.*

*Second,* plaintiffs allege Ancestry offers a "free trial," during which "users receive access to the same . . . records . . . available to paying users," and that the "sole purpose in using [plaintiffs'] name, photograph, and likeness in the promotional 'free trial' version of its website is to advertise, sell, and solicit the purchase of paid subscription plans."  *Id.* at ¶¶ 26-27, 38-39.

*Third,* plaintiffs allege—on "information and belief"—that Ancestry has sent "promotional email messages" containing names and likenesses from yearbook records "that are intended to entice potential customers to purchase a paid subscription, and to entice existing customers to upgrade to more expensive plans."  *Id.* at ¶¶ 32, 44.

---

*Bilotta v. Citizens Info. Assocs., LLC*, 2014 WL 2050853, at *7 (M.D. Fla. May 19, 2014) (same); *Chambers v. Time Warner*, 2003 WL 749422, at *8 (S.D.N.Y. Mar. 5, 2003) (same).  Indeed, plaintiffs rely primarily on a case in which a court certified a damages class in the context of a *default judgment* where no opposition was filed and the court did not meaningfully assess the certification issues. *Huebner v. Radaris, LLC*, 2016 WL 8114189 (N.D. Cal. Apr. 12, 2016).  The only other case plaintiffs cite on this point *denied* certification of a damages class premised on a web site's "search results" and certified only an injunctive relief class for that group (for reasons that, as shown below, are readily distinguishable here).  *Fischer v. InstantCheckmate LLC*, 2022 WL 971479 (N.D. Ill. Mar. 31, 2022).

**Ancestry's Yearbook Database.**  Ancestry is a genealogy company that provides users access to historical records to trace their family histories.  *See* Ancestry.com; Declaration of Todd Godfrey ("Godfrey Decl.") ¶¶ 2-3.  These materials include digitized yearbook records in Ancestry's "Yearbook Database."  *Id.* at ¶ 3.  Some of these digital yearbook records are "searchable," meaning users of Ancestry's site can enter certain search terms in the Yearbook Database—for example, a name or location—which can pull up yearbook records that might be responsive to those terms.  *Id.*  In response to a search query, Ancestry will do one of the following: (1) present a list of search results that might match the user's query, (2) indicate the search is too broad, or (3) indicate there are no good matches. *Id.*  To the extent a results list is returned, it will vary based on the specific terms entered by the user. *Id.* at ¶ 4.  For example, a search for "John Smith" without further qualifiers pulls up a list of 55,271 results, as partially reflected in this screenshot:



*Id.* at ¶ 5.  On the other hand, a search for "Shon Morgan" in "Nevada, USA" does not return any results, as reflected in this screenshot:



DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Id.* at ¶ 6.  The lists in the two screenshots above do not "exist" in static form on Ancestry's site; they are instead generated only in response to a user's search and, as a result, will differ depending on the user-provided inputs.  *Id.* at ¶¶ 7-8.  The same is true of any other search result list on Ancestry's site, including those in paragraphs 27, 31, 39 and 43 of plaintiffs' complaint.  *Id.*

Non-subscribers who hover over the "View Record" icon for a record contained in a list of results will be able to see a thumbnail image of the full yearbook page and a list of the categories of information that might be available for that record.  *Id.* at ¶ 9.



*Id.*  These pop-up bubbles do not exist in static form on Ancestry's website and are instead created only in response to the user's interaction with the site.  To the extent Ancestry hosts a record in its database, but no user has ever searched for that record and scrolled over the "View Record" link, the pop-up bubble reflecting a thumbnail image of that record does not exist.  *Id.* at ¶ 10.

Certain (although not all) records in Ancestry's Yearbook Database are also "hintable."  *Id.* at ¶ 11.  This means the record might be included in a "hint" message sent to users who have signed up for an Ancestry account to inform the user of a record in which he or she might be interested.  *Id.* However, records only become "hintable"—and thus will only be included in a "hint" message—if the record is associated with someone who the user has added to his or her "family tree."  *Id.*  Without such action by an Ancestry subscriber, free trial user, or registrant, the record cannot become a part of a "hint" message.  *Id.*  Further, even certain yearbook records that are "hintable" have never been included in a "hint" message.  *Id.* at ¶ 12.  Although plaintiffs allege "hint" messages "include the

names, photographs, and likenesses of people Ancestry believes may be related to the recipient and encourage the recipient to sign up or upgrade their subscription plan," in fact the "hint" messages contain only the name the user chose to enter in his or her family tree (which might be no more than an initial), any birth or death year the user may have added in his or her family tree, the name of the database where the record is housed, and a link to "See your hint":



*Id.* at ¶ 12.

**<u>Plaintiffs' Yearbook Records.</u>**   Mark Sessa bases his claims on purported "advertisements" generated using four yearbook records: (1) a group photograph of the "Blue Freedom Singers" from his 1972 high school yearbook; (2) a school portrait from his 1970 high school yearbook; (3) a school portrait from his 1972 high school yearbook; and (4) a group band picture from his 1970 high school yearbook.  ECF No. 1 at ¶¶ 39, 43; Declaration of John W. Baumann ("Baumann Decl.), Ex. 9 ("Mark Sessa Tr."), at 65:5-12, 67:8-69:9.   His brother Anthony's claims are premised on purported "advertisements" generated using three yearbook records: school portraits from his 1975, 1976 and 1977 yearbooks.  ECF No. 1 at ¶¶ 27, 31; Baumann Decl., Ex. 8 ("Anthony Sessa Tr."), 55:22-56:22, 57:22-58:18.

Before filing this lawsuit, none of these records ever appeared in search results for anyone other than plaintiffs' counsel.  Godfrey Decl. ¶ 14.  Nor were any of these records ever viewed in a pop-up or accessed in part or in full by any free trial or other non-paying user other than plaintiffs' counsel.  *Id.*  Moreover, none of plaintiffs' yearbook records has ever been included in a "hint" email.  *Id.* at ¶ 15, Ex. 1 (Ancestry_00000699).  And no Ancestry user has ever interacted with—viewed in search results, hovered over, accessed the image or full yearbook page—any of these yearbook records in Nevada.  *Id.* at ¶ 14.  *See also* Mark Sessa Tr., 80:3-16, 90:17-22; *id.* 93:10-12, 93:22-94:6, 94:17-24; Anthony

1  Sessa Tr., 59:15-22; *id*. 67:6-68:21 (plaintiffs each conceded they do not know whether any user has

2  ever searched their names or whether their yearbook records have ever been included in any messages).

3  <u>**LEGAL STANDARD**</u>

4  "The class action is an exception to the usual rule that litigation is conducted by and on behalf

5  of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation

6  and citation omitted). "As the party seeking certification, Plaintiff . . . bears the burden of establishing

7  that he meets the requirements of Rule 23(a) and (b)." *Martinez v. Brown*, 2011 WL 1130458, at *8

8  (S.D. Cal. Mar. 25, 2011); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31

9  F.4th 651, 665 (9th Cir. 2022) ("plaintiffs must prove the facts necessary to carry" their burden to show

10  Rule 23 is "satisfied by a preponderance of the evidence").

11  "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

12  338, 350 (2011). "A party seeking class certification must affirmatively demonstrate his compliance

13  with the Rule." *Id.*  Courts reject a "certify now and worry later" approach. *Schwartz v. Upper Deck*

14  *Co.*, 183 F.R.D. 672, 675 (S.D. Cal. 1999) ("Conditional certification of an improper class on a

15  speculative possibility that it may later meet the requirements [of Rule 23] is improper.").

16  <u>**ARGUMENT**</u>

17  **I.**   <u>**PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW COMMONALITY,**</u>

18  <u>**TYPICALITY OR PREDOMINANCE AMONG LIABILITY ISSUES**</u>

19  The commonality requirement under Rule 23(a)(2) requires a plaintiff to demonstrate (1) "the

20  class members have suffered the same injury," which "does not mean merely that they have all suffered

21  a violation of the same provision of law," (2) a common issue exists that "is central to the validity of

22  each one of the claims," and (3) this common issue is "of such a nature that it is capable of classwide

23  resolution," meaning it can be resolved "in one stroke." *Dukes*, 564 U.S. at 349-50.  Similarly, for Rule

24  23(a)(3)'s typicality requirement, the test "is whether other members have the same or similar injury . . .

25  and whether other class members have been injured by the same course of conduct." *Hanon v.*

26  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up).

27

28

A plaintiff seeking to certify a damages class must also demonstrate "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance inquiry is more rigorous than Rule 23(a)'s commonality requirement." *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, 2008 WL 3179315, at *17 (D. Nev. June 20, 2008) (citation omitted). Under Rule 23(b)(3), the analysis focuses on whether "common questions present a significant aspect of the case and a single adjudication can resolve issues for all members of the class." *Id.* A class cannot be certified where individualized proof is needed to establish each class member's entitlement to relief.

Here, plaintiffs argue that "Ancestry's liability hinges on its commercial use of Class members' names and yearbook photographs in three types of advertisements for its subscription service"— specifically, search results displayed to non-paying users; yearbook records displayed to free trial users; and "hint" emails incorporating yearbook records. Mot. at 6, 10. Plaintiffs contend "Ancestry incorporates every Class member's name and likeness into the same advertisements in the same way" and, as a result, "liability may be established by common proof" and "Plaintiffs' claims arise from the same course of conduct." *Id.* at 6-7, 10.

Plaintiffs' position, however, rests on a fundamental misstatement of the facts and law. Contrary to plaintiffs' unsupported assertion,[2] the challenged "advertisements" do not exist "in the same manner for every student in Ancestry's database, and therefore for every class member." *See* Mot. at 2. As a result, the question whether each class member was subjected to "commercial use" of

---

[2]  Plaintiffs assert Ancestry's corporate representative, Mr. Godfrey, "confirmed that the screenshots in the Complaint accurately represent what any free trial user would see after searching for any person in Ancestry's yearbook database." Mot. at 6. However, even plaintiffs recognize such results are displayed only "*after searching*" Ancestry's site for the records. *Id.*. Accordingly, this testimony does not support their assertion these advertisements exist in the same form for every record and every class member. Moreover, plaintiffs misrepresent Mr. Godfrey's testimony: he merely confirmed the screenshots in the complaint "appear to be an accurate representation" of the results and landing pages for *specific* searches of *specific* records, not that they represent any search that might be conducted, which will of course vary depending on the terms of the search. ECF No. 103-5 ("Godfrey Tr."), 58:2-11. Mr. Godfrey also confirmed only that every record could become the subject of a hint email, not that (footnote continued)

1  his or her information within the meaning of Nevada's statute cannot be answered "in one stroke," and

2  would instead necessitate highly-individual inquiries. *Dukes*, 564 U.S. at 349-50.  Indeed, although it is

3  plaintiffs' burden to demonstrate compliance with Rule 23's requirements, they have failed to present

4  evidence that *any* putative class member's yearbook record was ever included in one of the purported

5  "advertisements."  Moreover, even were there a common answer to this question (there is not), it would

6  not resolve the "validity of each one of the claims." *See id.*  Rather, plaintiffs must also prove any use

7  (1) identifies the class member; (2) occurred in Nevada; and (3) falls outside the statutory exemptions.

8  Again, these questions do not generate common answers, nor do plaintiffs even suggest these issues can

9  fairly be resolved "in one stroke." *See id. See also, e.g.*, *Aburto v. Verizon California, Inc.*, 2012 WL

10  10381, at *6 n. 2 (C.D. Cal. Jan. 3, 2012) ("because Plaintiff fails to establish even one common

11  question, he necessarily fails to establish that common questions predominate").

12      **A.**      **The Alleged "Commercial Use" And "Injury" Differ From Record To Record**

13              **And Plaintiffs' Records Were Not Subject To The Alleged "Commercial Use"**

14          Plaintiffs have been clear it is not Ancestry's mere use of the yearbook information that gives

15  rise to their claims—they "have no objection to the distribution of their yearbooks." *Sessa v. Ancestry*,

16  Case No. 21-16618 (9th Cir.), ECF No. 16 at 16.[3]  Instead, plaintiffs take issue with purported use of

17

18  every record is or ever was the subject of a hint email. *Id.* 55:13-16; *see also* Godfrey Decl. at ¶ 12
    ("Certain yearbook records that are 'hintable' have never been included in a 'hint' message").

19  [3]  Nor could plaintiffs challenge the mere distribution of their yearbook records.  Among other bars to

20  such a claim, it would be preempted by the Copyright Act.  *See* ECF No. 36 at 29 (recognizing "merely displaying or publishing photographs depicting Plaintiffs" would be subject to preemption and relying

21  on plaintiffs' allegations their photographs were used in the purported "advertisements" to conclude plaintiffs' claims were not preempted); *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1016 (9th Cir. 2017)

22  ("our cases clarify that a publicity-right claim may proceed when a likeness is used non-consensually on merchandise or in advertising. But where a likeness has been captured in a copyrighted artistic visual

23  work and the work itself is being distributed for personal use, a publicity-right claim is little more than a thinly disguised copyright claim").  Likewise, although Ancestry acknowledges the Court's earlier

24  determinations that immunity under section 230 of the Communications Decency Act does not attach where a party "was responsible for posting the information in its database"—a determination with which

25  Ancestry respectfully disagrees—Ancestry further notes plaintiffs' arguments that Ancestry itself was the "information content provider" based on creation of the purported "advertisements" (*see* ECF No. 26

26  at 17-18) would not apply to the mere distribution of the yearbook records.

27

28

their images "in advertisements for subscriptions to Ancestry.com." *Id.* Plaintiffs identify three alleged "advertisements" aimed at non-paying users of Ancestry's site: (1) "teaser" profiles that appear when non-subscribers hover over a search result after querying Ancestry's yearbook database; (2) access to yearbook profiles by "free trial" users; and (3) "hint" emails sent to non-paying subscribers. Mot. at 6.[4]

Although these three uses are the crux of plaintiffs' certification motion, plaintiffs have no record basis to contend they exist "in the same manner for every student in Ancestry's database, and therefore for every class member." Mot. at 2. In fact, the "teaser" profiles *do not exist* for a given yearbook record absent (1) a search by a non-paying subscriber using parameters that match that record; and (2) a decision by the non-paying subscriber to "hover" over the search result. Godfrey Decl. at ¶¶ 9-10. Likewise, a "hint" email *does not exist* for a yearbook record unless (1) a person who has signed up for Ancestry's services has added the likely subject of the record to his or her "family tree," and (2) the "hint" email is generated based on a variety of factors (such as the likely familial relationship with the user). *Id.* at ¶¶ 11-13. And plaintiffs' contention Ancestry uses yearbook records to advertise to its "free trial" users—by allowing free trial users to search and view records in Ancestry's database—is contingent on the free trial users *accessing* those records. Mot. at 6. Absent such access, the purported use of the record as an "advertisement" never occurred, and plaintiffs' claims would be premised on no more than the mere availability of a yearbook in Ancestry's database—a claim that would undoubtedly be preempted by the Copyright Act. *Supra* fn. 3; *Maloney*, 853 F.3d at 1016 ("a publicity-right claim may proceed when a likeness is used . . . in advertising. But where . . . the work itself is being distributed for personal use, a publicity-right claim is little more than a thinly disguised copyright

---

[4]  This approach is also consistent with the Court's order on Ancestry's motion to dismiss. *See* ECF No. 36. The Court relied on plaintiffs' allegations their yearbook records *had been used* in "targeted email advertising to Plaintiffs' relatives to advertise Ancestry's subscription services," and that "limited access users *have accessed* Plaintiffs' profiles, and when the users scrolled over the 'View Record' link on the profile, they *were presented* with a pop-up advertisement bearing Plaintiffs' names and images that encouraged them to 'Sign Up Now' for a paid subscription" to conclude plaintiffs had alleged use for commercial purposes. *Id.* at 12 (emphases added).

claim").[5]  Indeed, that certain records (and thus certain putative class members' names or likenesses) were never utilized in any of the challenged ways is demonstrated by the undisputed evidence showing that none of the named plaintiffs' *own* records ever appeared in search results, or were viewed by, or hinted to any non-paying Ancestry users (other than their own counsel) before plaintiffs initiated this lawsuit.  (*See* concurrent Motion for Summary Judgment).  In fact, plaintiffs have failed to present evidence that *any* putative class member's yearbook information was included in any of the purported "advertisements" they challenge.  *See Olean*, 31 F.4th at 665 ("plaintiffs must prove the facts necessary to carry" their burden to show Rule 23 is "satisfied by a preponderance of the evidence").

Establishing the type of "commercial use" that plaintiffs challenge is of course a threshold requirement under plaintiffs' liability theory.  It is also necessary to satisfy plaintiffs' theory for Article III injury.  ECF No. 36 at 12 (the "allegations indicate that Ancestry has used Plaintiffs' likeness for commercial purposes, which suffices to establish injury in fact under the common law tort").  Plaintiffs, however, have failed to meet their burden to demonstrate this central question can be resolved "in one stroke."  *Dukes*, 564 U.S. at 349-50.  *See also In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 461 (N.D. Cal. 2012) (denying certification where plaintiffs "have not shown they can establish injury

---

[5]  Further, according to plaintiffs, more than 730 million yearbook records exist in the database (ECF No. 1 at ¶ 16) of which at least 2,654,270 are from Nevada.  ECF No. 115 at ¶ 11 ("Kupperberg Declaration").  The *potential* that a particular individual might be amongst those millions of records does not give rise to a misappropriation claim, which instead depends on the use of a *particular person's* name or likeness.  Plaintiffs cannot plausibly contend any "name" or "likeness" was used to solicit a free-trial member to purchase a subscription without proof that "name" or "likeness" was ever actually viewed by a free-trial subscriber.  To hold otherwise would allow a plaintiff to proceed with a misappropriation claim against any website offering access to information about individuals *without regard to whether that individual's information actually appears on the site*—the mere potential that it *might* would suffice.  That, of course, would be entirely inconsistent with Nevada's right of publicity law, which requires actual *use* of a name or likeness.  Nev. Rev. Stat. § 597.790.  It would also be inconsistent with common law misappropriation claims generally, which require a plaintiff to be identifiable in the alleged use.  *E.g., Motschenbacher v. R. J. Reynolds Tobacco Co*., 498 F.2d 821, 826-27  (9th Cir. 1974) ("[I]f the … plaintiff is not identifiable in the [alleged use], then in no sense has plaintiff's identity been misappropriated nor his interest violated.").

1  through common proof"). [6]  And because plaintiffs' records were not used in the way they challenge,

2  they cannot show their own claims are typical of those they seek to represent (*i.e.*, those whose records

3  *did* appear in the purported "advertisements").  *See Hanon*, 976 F.2d at 508 (typicality requires that the

4  plaintiff "have the same or similar injury" as the putative class members).  To the contrary, the record

5  confirms neither commonality nor typicality could be satisfied here—whether any yearbook record (and

6  thus any putative class member's name or likeness) appeared in one of the three "advertisements" will

7  depend on a variety of user-related factors and thus differs from record-to-record and class member-to-

8  class member, and plaintiffs (in particular) were *not* featured in any such "advertisements."

9         Where, as here, a plaintiff's claims depend on an alleged use that differs among the class

10  members, certification is inappropriate.  For example, in *Chambers*, the recording artist plaintiffs

11  alleged the defendant, MP3.com, had misappropriated their and the class members' names and

12  likenesses by, among other uses, displaying their names as a "featured artist" on the "splash page" for

13  the defendant's website.  2003 WL 749422, at *7.  However, the court found this alleged "use" did "not

14  apply to every class member."  *Id.*  Rather, it was "highly unlikely that most (or even many) of [the

15  class] have had their names and likenesses presented under the label of 'featured artist.'"  *Id.*  As a

16  result, "determining which class members' names and likenesses have been used by MP3.com and the

17  manner and extent of such use would embroil the Court in a fact-finding quagmire."  *Id.*  So too here.

18  As in *Chambers*, the alleged uses on Ancestry's website "do not apply to every class member," and

19  plaintiffs have offered no means by which a determination this use *did* occur with respect to any record

20  can be made without the type of "fact-finding quagmire" the court rightly avoided in *Chambers*.

21

22

23

24

25

26

27

28

---

[6]  Although plaintiffs identify several purportedly "common" issues (Mot. at 8-9), questions of consent, the purported "economic value" of class members' yearbook records, and the appropriateness of damages or injunctive relief each require, in the first instance, there must be a classwide determination whether any alleged "commercial use" occurred.  *See* Nev. Rev. Stat. §§ 597.780, 597.790, 597.810 (statute applies only to any "commercial use" in Nevada; consent required only for "commercial use"; damages and injunctive relief available only for unauthorized "commercial use").  Indeed, even plaintiffs recognize liability (and thus commonality) "hinges" on "commercial use of Class members' names and yearbook photographs in [the] three types of advertisement[s]" plaintiffs challenge.  Mot. at 6.

Although plaintiffs appear to acknowledge this issue, they fail to offer evidence that any of the yearbook records were used in one of the challenged ways, nor any classwide method through which a jury could make such a determination. Instead, plaintiffs argue "whether an advertisement was viewed by a member of the public is not relevant to a right of publicity claim," *see* Mot. at 10, a position that conflates the issues and misstates the law.

The lack of uniformity among the class claims derives foremost from whether the records at issue were ever used in the ways to which plaintiffs object, not whether the resulting "advertisements" (if they ever came into existence as a result of a user search or hint email) were viewed. For this reason, the three cases on which plaintiffs rely are entirely inapposite. In *Knapke v. PeopleConnect Inc.*, 553 F. Supp. 3d 865 (W.D. Wash. 2021), the court credited (at the pleading stage) plaintiff's allegation the defendant had used "her image to market its products and services on the internet." *Id.* at 876. Thus, unlike here, the issue was not the *existence* of the alleged "advertisements," but instead the defendant's contention a plaintiff must *also* allege "that members of the public saw the offending image." *Id.* The same is true of *Siegel v. ZoomInfo Techs. LLC*, 2021 WL 4306148 (N.D. Ill. Sept. 22, 2021)—there, the court credited (again, at the pleading stage) the plaintiff's allegation "ZoomInfo used her identity in the free previews to advertise, promote, and offer for sale its monthly subscription for its database." *Id.* at *4. Thus, unlike here, the existence of the advertisement was not at issue. *Id.* (noting "[i]t may very well turn out that Plaintiff is unable to prove the 'holding out' aspect of 'commercial purpose,' but, for now, the Court finds Plaintiff has sufficiently stated a claim for relief based on alleged violations of IRPA."). Finally, in *Fischer*, 2022 WL 971479, the plaintiffs defined one of their damages classes to include only those for whom "a Search Result was listed on the Website" that "was actually selected by a user of the Website." *Id.* at *3. Thus, to the extent the plaintiffs characterized these search results as the alleged "advertisements" giving rise to their claims, their existence was not in dispute—the class was limited to those for whom a search result existed. *Id.* at *11. And notably, *Fischer denied* certification of the plaintiffs' damages class to the extent premised on the alleged

display of "search results," finding the plaintiffs had not offered a "workable solution" to determine who might fall within the class. *Id.* at *12.[7]

Here, plaintiffs' inability to prove the "advertisements" on which they concede liability "hinges" (Mot. at 6, 8) ever existed for each member of the class precludes plaintiffs from offering "common *answers* apt to drive the resolution of the litigation." *See Dukes*, 564 U.S. at 350. As a result, individualized inquiries will necessarily predominate. *See, e.g.*, *Aburto*, 2012 WL 10381, at *6 n. 2 ("because Plaintiff fails to establish even one common question, he necessarily fails to establish that common questions predominate"). And their inability to prove the "advertisements" exist even for their *own* yearbook records renders them atypical of the class they purport to represent. *Hanon*, 976 F.2d at 508.

---

[7] Although none of these cases support plaintiffs' assertion that they may proceed with right-of-publicity claims premised on "advertisements" that *do not exist*, their reliance is further misplaced given the underlying differences in the state laws at issue. *Fischer*, 2022 WL 971479, at *10; *Siegel*, 2021 WL 4306148, at *2. Unlike Nevada's statute, which defines "commercial use" to include only "***use*** of the name, voice, signature, photograph or likeness of a person . . . for the purposes of advertising, selling or soliciting the purchase of any . . . service," Nev. Rev. Stat. § 597.770, Illinois' statute further prohibits "holding out" a person's name or likeness in connection with certain activities. 765 ILCS 1075/5. *Fischer* and *Siegel* determined the latter "holding out" prohibition—which does not exist under Nevada's law—renders irrelevant whether "the individual's identity was seen by others" because the prohibition against "public use"— akin to Nevada's prohibition against actual "use"—*does* require that "some substantial number of people saw or were exposed to a person's identity," and the Illinois legislature must have intended something different through its prohibition on "holding out." *See Fischer*, 2022 WL 971479, at *10. Accordingly, plaintiffs are wrong that either *Fischer* or *Siegel* stand for the proposition that actual viewing by a third party is unnecessary under *Nevada* law—to the contrary, the *Fischer* court explicitly concluded this *is* required to satisfy the prohibition against "public use," and Nevada's statute prohibits only actual "use." In all events, the court's orders in *Fischer* and *Siegel* have been cast in doubt by the Seventh Circuit's decision in *Huston v. Hearst Communications, Inc.*, 53 F.4th 1097, 1100-01 (7th Cir. 2022), which held a plaintiff cannot allege his or her identity was "used" or "held out" for purposes of advertising if such "use" or "holding out" occurred only *after* a customer had already purchased the product or service it was allegedly used to advertise. *Id.* ("[A]ny use or holding out must either accompany an offer to sell or precede the sale . . . , but it cannot follow the sale. A person's identity cannot be employed to sell a product if their identity is only revealed after the sale is completed"). This holding would apply equally here—even to the extent the alleged "advertisements" existed, plaintiffs cannot contend a yearbook record was used to advertise, sell or solicit Ancestry's service where it was only viewed *after* the sale.

**B.      Even As To Those Instances of a Challenged Use, Plaintiffs Concede**

**Recognizability Of The Subjects Requires Individual Assessments**

This Court has recognized that Nevada's right of publicity law requires a plaintiff to prove that he or she is identifiable through the challenged use of the name or likeness.  ECF No. 36 at 12 n.4 ("the use of one's likeness to promote a product is sufficient to state a right of publicity claim . . . ***as long as the person is recognizable***") (emphasis added).  Because the core of the right of publicity is use of a person's *identity*, there can be no violation if the individual cannot be identified in the purported use.  *Motschenbacher*, 498 F.2d at 827 ("[I]f the . . . plaintiff is not identifiable in the [alleged use], then in no sense has plaintiff's identity been misappropriated nor his interest violated.").

Here, however, the ability to identify a person depicted in a yearbook image differs from record to record, as the testimony of the named plaintiffs illustrates with respect to each of the three  forms of "advertisements" at issue:

- Both plaintiffs admitted they could not identify *even themselves* in certain of the purported "previews" on which they base their claims.  Mark Sessa Tr. 70:4-71:13 (admitting he could not identify himself in the "preview" image depicted in paragraph 39 of the complaint); *id*. at 72:12-74:8 (admitting, for another record, he could not identify himself from the image and only knew he appeared in the photograph because he remembered taking it and had earlier seen a higher resolution version); Anthony Sessa Tr. 47:13-22, 48:14-50:10 (admitting he could not identify himself in one of his "previewed" yearbook records).  In fact, Mark Sessa candidly admitted it was *not true* that his face was "plainly visible" in these images, as he had alleged in his complaint.  Mark Sessa Tr. 75:2-77:14.

- With respect to search results, both plaintiffs admitted they could not identify *even themselves* in the lists (ECF No. 1 at ¶¶ 31, 43), and acknowledged that the results—which do not contain any images—may very well reflect the records of others by the same name who happened to attend school in Nevada.  Mark Sessa Tr. 53:10-54:4, 58:8-16; Anthony Sessa Tr. 64:2-65:5.

- With respect to "hint" messages, neither plaintiff knew whether they had been included in one (they have not) nor the information that might be included in such a message.  Mark Sessa Tr. 92:8-95:11; Anthony Sessa Tr. 67:6-68:21.  Contrary to the admittedly baseless allegations in their

complaint, "hint" messages do *not* contain "photographs" or "likenesses," (*see* ECF No. 1 at ¶¶ 32, 44), and instead include only a name or partial name (depending on what a user chose to enter), any birth or death year the user may have added in his or her family tree (exactly as entered by the user), and the name of the database where the record is housed ("U.S., School Yearbooks, 1900-2016").  Godfrey Decl. at ¶ 12.  Thus, "hint" messages contain even *less* information than "search results" lists—which include a school location—that plaintiffs admitted they were unable to use to identify even themselves.[8]

Of course, the same is true of other purported "advertisements" that include yearbook records. By way of example, one of the yearbook photographs on which plaintiffs base their claims lists the name of another student in a group photograph, but the photograph crops the image of the student such that plaintiff admitted the student (his fellow bandmate) was not identifiable in the picture.  Mark Sessa Tr. 81:19-85:5.  Other yearbook records contain nothing more than a name in an index among a list of many others, certain of which might be the exact same name, as highlighted in the below screenshot:



---

1

Godfrey Decl. at ¶ 18.  And even where a search is conducted *and* the record contains a picture,

2

a user might see only "John Smith, Las Vegas," with a thumbnail or full image (depending on whether

3

a user is an Ancestry subscriber) depicting hundreds of students:

4



10

11

Godfrey Decl. at ¶ 19.[9]  The ability to identify that particular "John Smith," whether it is the John Smith

12

a user was seeking, or whether it is a specific putative class member will vary depending on the

13

underlying yearbook record (*e.g.,* whether it includes a photograph and, even if it does, whether the

14

photograph is a group photograph or if the particular person's image is obscured or cropped, etc.), *and*

15

the person's specific information (*e.g.*, the uniqueness of the name, whether the person is from a small

16

or large town or high school, etc.).[10]

17

18

_____

19

[9]  Moreover, the items of information plaintiffs identify as appearing in the purported "advertisements"

20

are associated together only when a user conducts a search, views a record, or when a "hint" message is
sent.  Godfrey Decl. at ¶¶ 8, 10.  In the absence of such a search (or "hint"), the record reflects only what

21

the high school yearbook editors chose to include—at best, a list of names below a picture depicting
dozens of students, and often nothing more than a partial picture (without even a face).  As shown in Part

22

B, plaintiffs have offered no class-wide method through which they can prove which yearbook records
were searched, viewed, or hinted, such that even the limited information to which they point would have

23

been associated together for any record.

24

[10]  And of course most pictures featured in the yearbook database are *decades* old—even among the few
pictures that clearly identify a specific student, whether the name or image could be used to identify the

25

subject at the time the picture was allegedly "misappropriated" will vary.  People change their names,
their appearances, and residences—an image of a braces-wearing, thirteen year old named "Penny

26

Jones" in a 1950s yearbook from Las Vegas might be unrecognizable as the octogenarian "Penelope
Williams" who now lives in Reno.

27

28

Where, as here, each instance of challenged use must be individually assessed to determine if a putative class member is even *identifiable*, certification is improper.  For example, in *Dancel*, the plaintiff asserted right-of-publicity claims and sought to certify on the theory the defendant had misused photographs and usernames on its webpage to promote vouchers for businesses.  949 F.3d at 1002.  As here, the identifiability of a given putative class member differed depending on the content of the underlying record.  *Id.* at 1009 ("[P]rotection extends only so far as that photograph, that name, that username serves to identify that individual to an ordinary, reasonable viewer.  Not all photographs, names, or usernames will do so, and whether any does must be answered with individual proof[.]") (quotations, citations omitted).  Accordingly, the Seventh Circuit held the district court appropriately denied certification—the plaintiff could not "answer the question" "[w]hether the appropriated attribute serves to identify a particular person" through the "proposed common evidence, and so she cannot develop, for each class member, a common prima facie case under the identity element of an IRPA claim." *Id.*

So too here.  In addition to determining if a challenged "advertisement" ever came into existence, further assessing whether that use identifies a specific person would entail a "comparative exercise that depends on both the specific individual and the specific appropriated attribute in question," and thus "cannot be solved categorically here."  *Id.*[11]

---

[11]   Plaintiffs might rely on *Fischer*, which distinguished *Dancel*, but the facts here differ materially.  *Fischer* involved a search engine that delivered a "profile" of the individual with "personal attributes used on Instant Checkmate's website—name, age, location(s), and possible relative(s)." *Fischer*, 2022 WL 971479, at *8.  The putative class in *Fischer* was defined to include only individuals for whom "a Search Result was listed … that included" those specific attributes.  *Id.* at *12.  Thus, *Fischer* concluded a jury could find as a categorical matter that "a search result displaying a name, age, location(s), and relative(s) 'serves to identify that individual to an ordinary, reasonable viewer' for IRPA purposes." *Id.* at *8.  Indeed, the court suggested it was this "combination of … attributes [that] makes unique identification plausible." *Id.*  In contrast to the up-to-date combination of attributes in *Fischer*, plaintiffs here have not limited their class to include only those with records for which certain attributes are present, nor could they—the information available necessarily differs from record-to-record depending on the content of the underlying yearbook.  And even where certain attributes are tied together for a specific record—as they are, for example, in the search results list—even plaintiffs admit that combination alone can be insufficient to identify the subject.  But that will, of course, differ depending (footnote continued)

1

**C.  Plaintiffs Cannot Offer A Common Answer To Whether Any Alleged**

2

**Commercial Use Occurred In Nevada, And Their Own Claims Are Atypical**

3

Nevada's right of publicity law governs only "commercial use" of a name or likeness *within the*

4

*state of Nevada.*  Nev. Rev. Stat. § 597.780 (limiting the law "to any commercial use *within this state*"

5

and "regardless of the person's domicile") (emphasis added).  In other words, plaintiffs' limitation of

6

their class to only "Nevada residents" is completely meaningless.  It matters not whether a person is

7

domiciled in Nevada, but instead whether the *challenged use*—here, the alleged display of yearbook

8

records in one of the specific ways plaintiffs challenge—occurred in Nevada.  *See, e.g.*, *Fifty-Six Hope*

9

*Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 688 F. Supp. 2d 1148, 1162-63 (D. Nev. 2010) ("the ***unauthorized***

10

***use*** triggering the registration requirement ***must be in Nevada***") (emphases added).  *See also Boshears*

11

*v. PeopleConnect, Inc.*, 2022 WL 888300, at *3 (W.D. Wash. Mar. 25, 2022) ("The Court agrees with

12

Classmates that the IRPA's territoriality provision requires the 'act or event' occurring in Indiana to be

13

the non-consensual commercial use of the personality.").

14

Once again, this threshold issue is necessary to any liability finding—the statute simply does not

15

apply to uses outside Nevada—but plaintiffs have failed to propose any means to establish, on a group

16

basis, whether the "Nevada resident" class members' yearbooks were ever searched or displayed *in*

17

*Nevada*.  Nor could they.  Plaintiffs cannot even identify what yearbook records might be at issue in

18

this case: that someone is now a "Nevada resident" says nothing of where the person attended school

19

and thus what records they would need to demonstrate were "used" in Nevada.  And even were

20

plaintiffs to identify the records at issue, the question whether they were "used" in Nevada does not

21

generate a common answer, *see Dukes*, 564 U.S. at 349-50, and individualized issues would thus

22

predominate, *see Aburto*, 2012 WL 10381, at *6 n. 2.  Indeed, the few records plaintiffs have identified

23

_____

24

on the information reflected—"Geronimo Throndsen" from Puckerbrush, Nevada may very well be
identifiable by name and school location alone, while "John Smith" or "Tony Sessa" from Las Vegas,

25

Nevada are not.  *See Dancel*, 949 F.3d at 1009 (recognizing that whether "even a name[] serve[s] to

26

identify an individual . . . is a comparative exercise that depends on both the specific individual and the
specific appropriated attribute in question").

27

28

1    (their own) demonstrate this.  Not a single one of plaintiffs' yearbook records has *ever* been used in the

2    challenged ways in Nevada.   Godfrey Decl. at ¶14.   Put differently, because these types of

3    "advertisements" *do not exist* at all absent user interactions that targets the records, it follows that they

4    do not exist *in Nevada* absent such user engagement *in Nevada*.[12]

5          Because the answer to the question whether any specific yearbook record was "used" in the

6    challenged manner *in Nevada*[13] will differ from record to record, certification is improper.  *See, e.g.*,

7    *Cruz v. Lawson Software, Inc.*, 2010 WL 890038, at *9 (D. Minn. Jan. 5, 2010) (denying certification

8    where the statute did "not apply extraterritorially and an individualized inquiry into each putative class

9    member would be necessary to determine whether the [statute] could be applied").  *Cf. Patel v.*

10   *Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019) (questions of extraterritoriality did not defeat

11   certification only where, unlike here, the statute did not clarify what activities were subject to its

12   territorial scope; the court held this disputed point of law could be resolved for the class as a whole, but

13   recognized "if future decisions . . . lead to the conclusion that extraterritoriality must be evaluated on an

14   individual basis, the district court can decertify the class").  And because *none* of plaintiffs' own

15

16

17

---

18   [12]   The yearbook records are uploaded to the website in Utah and hosted on Ancestry's servers in
     Utah. Godfrey Decl. at ¶ 24.  Thus, although merely hosting the records in its server is insufficient to
19   invoke Nevada's right of publicity statute and would be incompatible with plaintiffs' liability theory
     here (*supra* at n.3), even were this sufficient (it is not), this activity could not even arguably be said to
20   have taken place in Nevada.
     [13]   Personal jurisdiction is distinct from the statute's territoriality requirement, which does not look at
21   the reach or accessibility of Ancestry's website generally, but instead whether the specific "use" of any
     record occurred within Nevada.   *Cf. McBee v. Delica Co.*, 417 F.3d 107, 124 (1st Cir. 2005)
22   (recognizing the considerations for personal jurisdiction and extraterritoriality "are distinct," and
     holding, with respect to the latter, that allowing "the Lanham Act to automatically attach whenever a
23   website is visible in the United States would eviscerate the territorial curbs on judicial authority that
     Congress is, quite sensibly, presumed to have imposed in this area").  Further, this Court's personal
24   jurisdiction inquiry accepted as true plaintiffs' allegations their yearbook records were featured in the
     challenged "advertisements," concluding a plausible market for those "advertisements" existed in
25   Nevada. *See* ECF No. 36 at 15-17.  Discovery has since shown that is not true of plaintiffs' records and
     will differ from record to record.
26

27

28

1  records was ever "used" *in Nevada*, their claims are not typical of those they purport to represent (*i.e.*,

2  those who *could* arguably invoke Nevada's right-of-publicity statute based on a use in Nevada).[14]

3  **D.**  **Whether Any Alleged Use Was "Directly Connected with Commercial**

4  **Sponsorship" Differs Depending On User Engagement And Plaintiffs Are Not**

5  **Typical Of Those Whose Records They Contend Were "Directly Connected"**

6  Plaintiffs' burden requires them to "pro[ve] that the disputed uses [of their names or likenesses]

7  f[all] outside the exemptions" to the right of publicity statute. *See Gionfriddo v. MLB*, 94 Cal. App. 4th

8  400, 417 (2001).[15]  Nevada law excepts from liability any use of a name or image that is "not directly

9  connected with the commercial sponsorship."  Nev. Rev. Stat. § 597.790.  In ruling on Ancestry's

10  motion to dismiss, the Court found (1) this exception does not apply to hint emails;[16] and (2) "[w]hile a

11  closer case," plaintiffs had sufficiently pled at the motion to dismiss stage that access to their records by

12  "free trial" users, and the appearance of their records in searches, were directly connected to

13  commercial sponsorship.  ECF No. 36 at 25.

14  However, plaintiffs concede not every yearbook record was the subject of a "hint" message—

15  indeed, plaintiffs' own records were not.  Godfrey Decl. at ¶ 15, Ex. 1.  Whether a yearbook record was

16  included in a hint message sent to a non-paying subscriber—and thus whether plaintiffs might

17

---

18  [14]  Plaintiffs may rely on *Fischer* to argue a limitation on extraterritorial application is not a bar to class
19  certification.  *See* 2022 WL 971479, at *10-11.  In *Fischer*, however, the statute at issue (Illinois') did
20  not have an express territoriality requirement as Nevada's does.  Instead, the court looked to various
   common law considerations governing extraterritorial application, including that the classes were
   "limited to Illinois residents."  *Id.*  As a result, the court disregarded the individualized questions that
21  might arise from resolving the question of "where [the defendant's] users viewed the putative class
   members' profiles."  *Id.*  Here, however, Nevada's statute makes clear the domicile of the plaintiff is
22  irrelevant and instead the plaintiff must demonstrate the actual *use* occurred in Nevada—the question the
   *Fischer* court avoided would thus be central to an analysis under Nevada law.
23  [15]  *See* ECF No. 36 at 23 ("Nevada courts look to California law where Nevada law is silent").
24  [16]  Plaintiffs falsely contend in their complaint that "hint" emails contain images from the hinted record
   and "invite the recipients to purchase Ancestry subscriptions to learn more about Plaintiff."  *Compare*
25  ECF No. 36 at 24-25 (citing ECF No. 1 at ¶¶ 12, 32, 44) *with* Godfrey Decl. at ¶ 12.  Neither assertion is
   true (*see id*) and, in fact, "hint" messages are delivered primarily to those who are already paying
26  subscribers.

27

28

demonstrate a "direct connection" with commercial sponsorship on this basis—would require a record-by-record inquiry.  Godfrey Decl. at ¶ 16.

Likewise, at the motion to dismiss stage, the Court relied on plaintiffs' allegations their records had, in fact, been viewed or searched to conclude plaintiffs had alleged the "previews" are sufficiently connected to "commercial sponsorship" to raise a triable issue of fact.  ECF No. 36 at 25 ("***If a prospective subscriber searches for Plaintiffs' names and tries to click through to their information***, a limited access user is presented with an advertisement to purchase a subscription. . . . Similarly, free-trial subscribers are expected to convert to paid users if ***their searches*** generate sufficient value to the trial subscriber") (emphases added).  Again, however, whether a yearbook record was actually searched or viewed—and whether it was searched or viewed by a non-paying user—will differ from record to record and can only be determined through extensive individual analysis of each record.  Godfrey Decl. at ¶ 16.  Thus, plaintiffs cannot rely on this alleged "use" to demonstrate a "direct connection" with commercial sponsorship for each of the 2,654,270 records plaintiffs contend are at issue, nor have they proposed any means through which this might be accomplished.

Where, as here, a "photo-by-photo inquiry would be required to determine . . . whether the photograph at issue" falls under a statutory exception to the right of publicity statute, "prosecuting [the] action on a classwide basis would necessitate myriad individual inquiries of each [individual] and disputed photograph."  *See Lightbourne*, 307 F.R.D. at 602-03 (denying class certification in right of publicity action where individual inquiries required to determine if photographs fell under California's exception for photographs of "definable groups"); *Jones*, 815 F. Supp. 2d at 1117 (denying class certification where analysis "depend[ed] on the circumstances surrounding each photograph").  And because plaintiffs' own records were not "used" in the manner they contend creates a direct connection to "commercial sponsorship," they are atypical of the class.  *See Jones*, 815 F. Supp. 2d at 1117.

**E.    Whether Any Alleged Use Related To Public Affairs Will Differ Depending On The Subject Of The Record**

Again, it is plaintiffs' burden to demonstrate their claims fall outside the exemptions to the right of publicity statute.  *See Gionfriddo*, 94 Cal. App. 4th at 416-17.  Among other uses, Nevada law

excepts from liability any commercial use of a name or image that is "in connection with a news, public affairs or sports broadcast or publication."  Nev. Rev. Stat. § 597.790(2)(c).  This exception does not turn on whether the use is "commercial"—this would write out the exception, which instead applies to "[a]ny *commercial use*" if such use is in connection with "public affairs."  Nev. Rev. Stat. § 597.790 (emphasis added).  *See also FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 154 (2019) ("[W]hether speech has a commercial or promotional aspect is not dispositive of whether it is made in connection with an issue of public interest.") (quotation, citation omitted).  Rather, the exception depends on the subject and content of the underlying record.  *See, e.g.*, *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 794-95 (1995) (sale of poster with images portraying Joe Montana's football victories were "a form of public interest presentation to which [First Amendment] protection must be extended").

Although the Court concluded at the motion to dismiss stage the alleged use of "*Plaintiffs'* names, images, and likenesses [was not] in connection with public affairs," ECF No. 36 at 26 (emphasis added), that conclusion cannot fairly apply to every record at issue.  Ancestry's database includes, for example, yearbook records for Justice Sonia Sotomayor, reflecting a high school's commemoration of her appointment to the Supreme Court:



DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION



Godfrey Decl. at ¶ 20.  Similar records exist for President Clinton, reflecting his visit to a high school in Hot Springs, Arkansas:



*Id.* at ¶ 21.  And Nevada Governor Joe Lombardo's yearbooks from Rancho High School in Las Vegas are accessible in Ancestry's database:

*Id.* at ¶ 22. So although the *named plaintiffs*' yearbooks arguably might not garner public interest, there can be little doubt the historical records for these (and many other) public figures *do*. Indeed, yearbook records for public figures have, at times, dominated news cycles. *See* Rebecca Jennings, *Why yearbooks keep revealing skeletons in politicians' closets*, Vox (Feb. 14, 2019), *available* at https://www.vox.com/the-goods/2019/2/14/18217419/northam-yearbook-blackface-reeves.

Determining whether any particular record concerns "public affairs" necessarily differs from record to record and thus cannot be resolved "in one stroke." *See Dukes*, 564 U.S. at 349-50. *See also, e.g.*, *Aburto*, 2012 WL 10381, at *6 n. 2 (if commonality is absent, individualized inquiries predominate).

## II. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW COMMONALITY, TYPICALITY OR PREDOMINANCE AMONG DAMAGES ISSUES

The Supreme Court made clear in *Comcast* that plaintiffs must show at the certification stage "damages are capable of measurement on a classwide basis." 569 U.S. at 34. Although the need for individualized damages determinations does not automatically preclude certification, the Ninth Circuit does require a plaintiff, consistent with *Comcast*, to show "there exist[s] a common methodology for calculating damages." *Doyle v. Chrysler Grp., LLC*, 663 Fed. App'x 576, 579 (9th Cir. 2016) (citation omitted). Here, plaintiffs fail to meet their burden under *Comcast* for multiple reasons.

A.   **Actual Damages Are Required And Cannot Be Established Classwide, And**

**Plaintiffs Are Not Typical Of Those Who Can Prove Actual Damages**

Plaintiffs attempt to gloss over the individualized issues infecting their damages claim by asserting each class member seeks only "statutory minimum damages in the amount of $750." Mot. at 10. However, this ignores the plain language of Nevada's statute, which provides for "*[a]ctual damages*, but not less than $750." Nev. Rev. Stat. § 597.810 (emphasis added). "Plaintiffs may not simply demand $750 in statutory damages . . . but rather must prove actual damages like any other plaintiff whose name has commercial value." *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 809-10 (N.D. Cal. 2011) (analyzing Cal. Civ. Code § 3344, which similarly provides that plaintiffs may recover "an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered") (quotation, citation omitted).

Plaintiffs have made no effort to show actual damages could be proven for each class member. *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *18 (E.D. Cal. Jan. 3, 2012) (a class should not be certified if the court would be required "to determine [the] individualized *fact* of damages").[17] Indeed, plaintiffs' own claimed "harm" is both highly personalized and not of the type for which Nevada's right of publicity statute provides compensation—plaintiff Mark Sessa, for example, contends his only "harm" is that someone might "baptize" him into a church with which he is not affiliated using only his name. Mark Sessa Tr. 121:10-123:12. *See also* Anthony Sessa Tr. 73:11-74:12; 75:6-76:25. Not only have plaintiffs failed to adduce evidence of actual damages to themselves, they have made no showing that *any* member of their vast and disparate class suffered any economic harm, let alone all of them. Determining whether each member was damaged by any actionable use of their name or likeness would

---

[17]   Although the Nevada Supreme Court in *Hetter v. Eighth Jud. Dist. Ct. of State In & For Cnty. of Clark*, 110 Nev. 513 (1994) commented in dicta that the $750 minimum can be used should a plaintiff fail to prove *the amount* of any damages, this does not mean a plaintiff can simply claim the $750 minimum without proving actual damage—to the contrary, *Hetter* expressly recognized the statute is intended to compensate only for the "commercial value of the use of [a plaintiff's] likeness, or what she could have received for sale of her" likeness. *Id.* at 519. *See also Catlin v. Washington Energy Co.*, 791 (footnote continued)

require highly individualized inquiries into each class member's public stature and prospects to monetize his or her personal information.[18]  *See Bilotta*, 2014 WL 2050853, at *1 ("[T]he Court cannot disregard the right of certain individuals to pursue damages based on the commercial value of their image due to their celebrity, *i.e.* pop star Justin Bieber and professional athletes Chad 'Ochocinco' Johnson and Manny Ramirez, whose images appeared on the Websites and would be part of the class.").  *Cf. Hetter*, 110 Nev. at 519 (damages under Nevada's statute are limited to "the commercial value of the use").  Courts have denied certification of right-of-publicity claims for precisely this reason, and the same result should follow here.  *See, e.g.*, *Lightbourne*, 307 F.R.D. at 602-03 ("individualized inquiries would be required even to determine many class members' entitlement to *statutory* damages . . . statutory damages are recoverable only upon a showing of actual damages . . . the fact that statutory damages are available does not lessen, let alone eliminate, the need for individualized inquiries").

---

F.2d 1343, 1350 (9th Cir. 1986) ("[T]he requirement that plaintiff prove 'both the *fact* of damage and the *amount* of damage . . . are two separate proofs.'") (citation omitted.)

[18]   To the extent plaintiffs argue the commercial value of class members' names might be established by the benefits *others* obtained as a result of the alleged use of this information—for example, the licensing fees PeopleConnect received in exchange for certain yearbooks or website subscription fees received by Ancestry (Mot. at 7-8)—the Nevada Supreme Court has expressly *rejected* any such interpretation. *Hetter*, 110 Nev. at 518-19 (rejecting plaintiff's argument the defendant's profit could provide a measure of damages for her right of publicity claim and holding instead that damages are limited to what *plaintiff* "could have received for sale of her before-and-after pictures").  Further, plaintiffs cannot demonstrate any connection between a specific yearbook record (or person) and any fees paid to PeopleConnect or subscription revenue received by Ancestry.  For example, Ancestry received certain yearbooks through donations (ECF No. 1 at ¶ 50) and others have never been viewed, let alone led to an Ancestry subscription.  Godfrey Decl. at ¶ 3.  There would thus be no "commercial value" for these records under this theory, yet plaintiffs have made no effort to distinguish those records from any others.  Nor have plaintiffs attempted to demonstrate how any purported "value" could be assigned to specific records or specific class members based on any license fees or subscription revenue—the license agreements each included thousands of yearbook records (*id.* at ¶ 23) and whether someone subscribed to Ancestry as a result of a particular record (as opposed to any other they might have viewed) is an inherently individualized inquiry.

### B.   Plaintiffs' Damages Model Is Untethered To Their Liability Theory

Any "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Comcast*, 569 U.S. at 35.  Here, plaintiffs seek "statutory damages of $750 for each photograph in the Ancestry database."  Mot. at 12.  This model is entirely unrelated to plaintiffs' theories of liability and injury: that a particular photograph exists in Ancestry's yearbook database says nothing of whether the photograph appeared in one of the purported "advertisements" on which plaintiffs base their claim.  *Supra* at I.A; Mot. at 6 ("Ancestry's liability hinges on its commercial use of Class members' names and yearbook photographs in three types of advertisement[s]").  Accordingly, "Plaintiffs' proposed damage model fails to satisfy the predominance requirement for the additional reason that it does not comport with Plaintiffs' theory of liability."  *See Opperman v. Kong Techs., Inc.*, 2017 WL 3149295, at *12 (N.D. Cal. July 25, 2017).

### C.   Even Could Plaintiffs Proceed Without Proof Of Actual Damages, They Have Failed To Demonstrate Damages Are Measurable Classwide

Plaintiffs purport to seek "statutory damages of $750 for each photograph in the Ancestry database."  Mot. at 12.  However, Nevada's statute allows a minimum of $750 in damages for the plaintiff's suit as a whole, not for each photograph or appearance.  Nev. Rev. Stat. § 597.810(b) (allowing recovery of $750 in "[a]n action at law for any injuries sustained by reason of the unauthorized use").[19]  Thus, even could plaintiffs proceed without proof of actual damage for each class

---

[19]   This makes sense—the right of publicity protects "the property interest that a celebrity has in his or her **_name_**" and seeks to compensate for "the economic loss a celebrity suffers when someone else interferes with the property interest that he or she has in his or her **_name_**."  *Hetter*, 110 Nev. at 518 (quotation, citation omitted) (emphases added).  The contemplated harm is the loss in value of a plaintiff's name or likeness, not a loss in value of a particular image, which is instead the purview of copyright law.  *See id.* ("Sanchez argues . . . she is entitled to $750 for each of Hetter's patients who saw her picture.  There is nothing in the statute or legislative history to suggest that this is a correct interpretation.").

member (they cannot) and even were plaintiffs' damage request tied to their liability theory (it is not), plaintiffs would still need to offer a methodology through which they can determine the number of "Nevada residents" for whom a "photograph" appears in Ancestry's yearbook database and who does not fall within one of the exceptions to their class definition (*i.e.*, those who are Ancestry subscribers or donated a yearbook to Ancestry). *See* Mot. at 4. They cannot do so.

Instead, plaintiffs rely on what they concede are mere "estimates" offered by their purported expert, Clifford Kupperberg. ECF No. 115. The inaccuracies in the guesswork performed by Mr. Kupperberg are readily apparent: he offers two different "estimates" of class size—the key component in plaintiffs' damages model—that vary drastically. *Id.* at ¶¶ 17 & 22 (estimating 143,650 using one "methodology" and 112,203 using another, a *28% difference*). What is more, each "estimate" rests entirely on unfounded assumptions. *See* Expert Report of Alan Salzberg; Ancestry's Motion to Exclude Plaintiff's Expert Clifford Kupperberg (filed concurrently). For example, Mr. Kupperberg acknowledges the number of individuals with Ancestry accounts in Nevada (*i.e.*, those who would be excluded from plaintiffs' class) actually *exceeds* the number of individuals he estimates appear in Nevada yearbook records on Ancestry's site (*i.e.,* the universe of potential class members). ECF No. 115 at ¶¶ 15-17. Rather than determine the overlap—which could result in *no class at all*—Mr. Kupperberg simply assumes, without basis, that the percentage of individuals appearing in Nevada yearbook records who also have Ancestry accounts is the *exact same percentage* as the proportion of Ancestry account holders within the *entire population of Nevada* (including, for example, newborn babies and minors who *cannot* have Ancestry accounts or yearbook records). *Id.* at ¶ 17. Baumann Decl., Ex. 7 (Expert Report of Alan Salzberg, "Salzberg Report") at 8. Indeed, even small adjustments to Mr. Kupperberg's unfounded assumptions can yield a class size of *zero*. *Id.* at 9, 13. Where, as here, plaintiffs have not offered "a ***sound methodology*** for proving [damages] on a class-wide basis . . . the

plaintiffs have not met their burden of showing common issues predominate."  *See Sidibe v. Sutter Health*, 333 F.R.D. 463, 498 (N.D. Cal. 2019) (emphasis added).[20]

Moreover, even could Mr. Kupperberg's purported damages model be used to calculate class damages (it cannot), plaintiffs' inability to identify who is actually in the class (or might receive any portion of the contemplated "aggregate" award) runs headlong into the Ninth Circuit's bar against "fluid recovery."  *See Gutierrez v. Wells Fargo & Co.*, 2009 WL 1247040, at *3 (N.D. Cal. May 5, 2009) ("In the Ninth Circuit, the best reading of the law is that fluid recovery is [not] allowed").[21]  The Ninth Circuit in *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) followed the Second Circuit's decision in *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973).  As *Eisen* explained, "[t]he concept of . . . 'fluid recovery' is very simple."  479 F.2d at 1010.  "'The class as a whole' is substituted for" the individual claimants, and the case is tried with "damages to 'the class as a whole' . . . assessed" and, if awarded, defendants "pay this huge sum into court[, which] is supposed to constitute the 'gross damages' to 'the class as a whole.'"  *Id.*  "[F]rom then on [the Court will] have the real notices soliciting the filing of claims, the processing of these claims, the fixing of counsel fees and the payment of the general expenses of administration."  *Id.*  As *Eisen* correctly concluded, "[e]ven if . . . Rule 23 could be read so as to permit any such fantastic procedure, the courts would have to reject it as an unconstitutional violation of the requirement of due process of law.  But as it now reads amended Rule 23 contemplates and provides for no such procedure. . . .  We hold the 'fluid recovery' concept and practice to be illegal . . . and wholly improper."  *Id.* at 1018.

---

[20]  Although plaintiffs are incorrect the minimum $750 in damages under the statute accrues for each picture, even were plaintiffs permitted to proceed on this theory, the same issues would arise: the number of Nevada yearbook records provides no indication how many yearbook records on Ancestry's site are associated with *Nevada residents*—people of course move away from the state following high school.  *See* Anthony Sessa Tr, 17:23-25 (plaintiff Anthony Sessa no longer lives in Nevada).  Nor does it provide any indication of the number of yearbook records for Nevada residents who (1) have an Ancestry account; or (2) donated a yearbook to Ancestry, both of which must be excluded under plaintiffs' class definition.

[21]  *Gutierrez* noted an exception to the rule: "where conventional methods of proof are demonstrably unavailable **and, even then**, only in an extraordinary circumstance such as the [*Hilao v. Estate of* (footnote continued)

Yet that is *precisely* what plaintiffs propose as their purported "damages" plan here.  Plaintiffs concede they cannot identify who is in their putative class (Mot. at 20-21), but propose that Mr. Kupperberg's assumed aggregate be substituted for those individuals (*see* ECF No. 115 at ¶ 24), with an "aggregate award against Ancestry," to be divided "among Class Members" through some undefined procedure (ECF No. 107 at 3) following a broad-scale, web-based notice plan (ECF No. 103-26).  As *Eisen* recognized, such a proposal is "illegal" and "wholly improper."  *Eisen*, 479 F.2d at 1018.  *See also In re Hotel*, 500 F.2d at 89-90 ("allowing gross damages by treating unsubstantiated claims of class members collectively . . . is clearly prohibited by the Enabling Act.").

## III.   PLAINTIFFS' PROPOSED TRIAL PLAN IS UNWORKABLE AND, AS A RESULT, PLAINTIFFS HAVE FAILED TO DEMONSTRATE THIS CASE IS MANAGEABLE AS A CLASS ACTION

Federal Rule 23(b)(3) further requires a plaintiff to demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  "[T]he predominance of individualized questions influences the court's assessment of [] manageability[.]"  *Wetzel v. CertainTeed Corp.*, 2019 WL 3976204, at *19 (W.D. Wash. Mar. 25, 2019).  *See also Zinser*, 253 F.3d at 1192 ("If each class member has to litigate numerous and substantial separate issues . . . a class action is not 'superior.'").

Here, as shown above, substantial individual issues abound: whether each class member's yearbook record appeared in one of the purported "advertisements"; whether each "advertisement" identifies the subject; whether the record was "used" in Nevada; whether any such "use" was "directly connected" to commercial sponsorship; whether the use concerned "public affairs"; and the amount of

---

*Marcos*, 103 F.3d 767, 782 (9th Cir. 1996)] case."  The *Hilao* case dealt with extreme violations of (footnote continued)

damages based on any alleged commercial loss must each be resolved on a record-by-record and class member-by-class member basis.

Further compounding these hurdles to group treatment, plaintiffs have not even attempted to identify who is in their putative class.[22] *See Wetzel*, 2019 WL 3976204, at *19 (denying certification on superiority grounds where "[p]laintiffs have developed relatively little information about the putative class. Indeed, they do not even provide a concrete estimate of its size."). Instead, plaintiffs propose the use of claim forms to overcome this deficiency. Mot. at 20. However, in addition to running afoul of the Ninth Circuit's prohibition against "fluid recovery," (*supra* at II.C), plaintiffs' proposal would plainly violate Ancestry's due process right to mount its defenses. *See Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) ("A class action . . . leaves the parties' legal rights and duties intact and the rules of decision unchanged.").

In particular, plaintiffs contend this claim form process could be used not only to establish each class member actually appears in a yearbook record on Ancestry's site (a key prerequisite for both liability and injury), but also to resolve whether class members consented to the use (again, a required showing for plaintiffs).[23] *See* Mot. at 20-21.[24] These are not mere administrative matters that can be delegated to a claims processor—they are central factual issues bearing on the merits of plaintiffs' claims. *See, e.g.*, *In re SFPP Right-of-Way Claims*, 2017 WL 2378363, at *14 (C.D. Cal. May 23, 2017) (where an issue presents a "threshold liability concern . . . the Court itself—not claims administrators—must rule on them. There is nothing administrative about [such required] findings").

---

human rights, such as state sponsored torture and execution, which do not apply here.

[22]  Plaintiffs misplace reliance on *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), which held only that Rule 23 does not impose a "freestanding administrative feasibility requirement"—as *Briseno* made clear, while no such independent requirement exists, this issue must nonetheless be assessed as part of the "superiority inquiry." *Id.* at 1128. *See also Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 633 (9th Cir. 2020) ("*Briseno* was narrow in focus. . . . *Briseno*, in fact, did not directly bear on predominance at all.").

[23]  Under Nevada law, a plaintiff must show the defendant used a name or image "without first having obtained written consent for the use." Nev. Rev. Stat. § 597.810.

*Cf. Lilly v. Jamba Juice Co.*, 2014 WL 4652283, at *6 (N.D. Cal. Sept. 18, 2014) (due process does not permit liability or injury to be "ascertain[ed] . . . on the basis of the applicants' own self-identification, giv[ing] a defendant no opportunity to challenge that determination, and [which] racks up the defendant's bill every time an individual submits a form").[25]  Resolving these and other issues[26] for each class member and each of the millions of yearbook records would necessitate highly individualized inquiries, and plaintiffs have not explained how that process might play out.  *See* ECF No. 107 (proposing an undescribed "claims administration protocol" to occur *post-judgment*, but providing no plan to address these challenges, each of which is required to be addressed *before* any judgment can be rendered).

        "These practical issues of manageability weigh heavily against a finding of superiority." *Wetzel*, 2019 WL 3976204, at *20.  This result is particularly warranted where, as here, the statute allows recovery of actual damages—and, at a minimum, $750 upon a showing of any actual damage—thus providing sufficient incentive for plaintiffs to pursue individual claims.  *See, e.g.*, *Alberghetti*, 263 F.R.D. at 582 (finding "little reason why a class action [under California's right of publicity statute] is

---

[24]  Indeed, plaintiffs' proposed claim form process does not even account for the consent provided by those who donated the yearbooks to Ancestry's site. *See* ECF No. 1 at ¶ 51 (acknowledging "consent of the donor herself").

[25]  Plaintiffs misplace reliance on *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292 (D. Nev. 2014) to contend "Class members may self-identify subject to verification." Mot. at 20.  In *Kristensen*, it was not self-identification alone that allowed class members to be identified—instead, the "[d]ata from T–Mobile calling lists [was] used to identify the individual class members." *Kristensen*, 12 F. Supp. 3d at 1303.  Ancestry's yearbook records cannot be used to identify who is in plaintiffs' putative class, and claimant has never argued otherwise nor attempted to identify those individuals.  Further, in *Kristensen*, "[c]onsent [was] not at issue" and thus, unlike here, plaintiffs were not requesting substantive legal issues to be resolved through an improper administrative procedure. *See id.*

[26]  In addition to issues of liability, injury and consent, a determination of which yearbook a claimant appears in and whether each claimant ever subscribed to Ancestry would also implicate other important issues, such as whether those claimants are bound by Ancestry's arbitration agreement and class action waiver (Godfrey Decl. at ¶ 25) and whether the claims are time barred. *See* ECF No. 112 (the parties stipulated the upload date for any yearbook record, and thus the starting point for the statute of limitations, is triggered from the date the yearbook in which the record appears was donated to or licensed by Ancestry; however, absent identification of which yearbook record is at issue, no such determination can be made and, even then, must be made on a record-by-record basis).

more efficient than individual actions"); *Wetzel*, 2019 WL 3976204, at *20 (superiority absent where plaintiffs were incentivized to bring individual suit).

## IV.   PLAINTIFFS CANNOT CERTIFY A CLASS UNDER RULE 23(B)(2) WHEN THEY SEEK DAMAGES FOR EACH CLASS MEMBER

At the threshold, because plaintiffs have failed to satisfy the commonality or typicality requirements under Rule 23(a), they cannot proceed with an injunctive relief class. *See* Fed. R. Civ. P. 23. Moreover, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages," as here. *Dukes*, 564 U.S. at 360-61. *See also* Fed. R. Civ. P. 23(b)(2), Advisory Comm. Note (1966) (this rule "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").[27]

Nor is there any basis for injunctive relief here. While blocking access to Ancestry's records may be the goal of plaintiffs (or their counsel), they have made no showing other class members desire such relief. To the contrary, plaintiffs' theory in this case is that non-paying users (like those they purport to represent) *want* to access their old yearbook records—and, in fact, are interested enough that they might pay to receive such access. *See generally* ECF No. 1; ECF No. 26 at 3 (contending, in opposition to Ancestry's motion to dismiss, that Ancestry used plaintiffs' "likenesses . . . to sell website subscriptions to the Plaintiffs' . . . classmates," who would of course appear in the same yearbooks). *See, e.g.*, *Alberghetti*, 263 F.R.D. at 577-78 (denying certification in right of publicity case where plaintiffs sought injunctive relief class members might oppose).

## CONCLUSION

For these reasons, plaintiffs' motion for class certification should be denied.

---

[27]   Where, as here, plaintiffs' request for injunctive relief simply seeks to lay a foundation for recovery of monetary damages Rule 23(b)(2) certification is improper. *See Herskowitz v. Apple, Inc*., 301 F.R.D. 460, 482 (N.D. Cal. 2014) (certification under (b)(2) inappropriate where "what Plaintiffs are truly seeking is a judicial declaration that could be individually enforced against Apple to obtain refunds in cases in which class members could demonstrate that they were wrongfully double-charged" and plaintiffs were "merely attempting to lay a foundation for individual damages request").

DATED this 2nd day of February

Respectfully submitted,

Quinn Emanuel Urquhart & Sullivan, LLP


_____/s/ Shon Morgan_____
Shon Morgan
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

**Attorneys for Defendants Ancestry.com Operations Inc., Ancestry.com Inc., and Ancestry.com LLC**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b)(2)(E), I hereby certify that on this day, I caused a true and correct copy of the foregoing to be served via the Court's electronic system on all registered and active parties.

DATED February 2, 2023.

/s/ *Shon Morgan*
Shon Morgan